# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## DIVISION AT KNOXVILLE

DYLLAN M. RIVES, an Individual,                )
                                               )
        AND                                 )
                                               )
JAMES R. RIVES, an Individual,                 )
                                               )
        Plaintiffs,                         )
                                               )
    v.                                      )
                                               )
UNIVERSITY OF TENNESSEE; a quasi-              )
    Governmental Corporation;               )
DONDE PLOWMAN, Individually And As             )
    Chancellor of UNIVERSITY OF             )
    TENNESSEE;                              )
UNIVERSITY OF TENNESSEE COLLEGE                )
    OF VETERINARY MEDICINE                  )
    (UTCVM), a quasi- Governmental          )
    Corporation;                            )
JAMES THOMPSON, Individually And               )
    As Dean of UTCVM;                       )
JOHN and ANN TICKLE SMALL ANIMAL               )
    HOSPITAL (UTSAH),                       )
    a quasi- Governmental Corporation;      )
JUERGEN SCHUMACHER, Individually               )
    And As Department Head of UTSAH;        )
LESLIE WERESZCZAK, Individually And As         )
    Director of Emergency and Critical Care )
    of UTSAH;                               )
KIMBERLY ANDERSON, an Individual;              )
VIRGINIE WURLOD-TALBOT, an Individual;         )
CAITLIN McMANEMON, an Individual;              )
BRETT HOGBERG, an Individual;                  )
JACK LEE, an Individual;                       )
                                               )
        AND                                 )
                                               )
Other Unnamed Individuals;                     )
                                               )
                                               )
        Defendants et. al.                  )

F I L E D

NOV 1 8 2022

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

CIVIL ACTION NO.

CV # 3:22-CV-414

Corker/McCook

Trial by Jury

# COMPLAINT

## JURISDICTION and VENUE

1.      This court has subject matter jurisdiction over the above styled action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because the cause of action arises under federal laws of the United States and because the cause arises as a result of injury to constitutionally protected property of the plaintiff(s), as well as deprivation of other constitutional rights and privileges. This court also has subject matter jurisdiction over the above styled action pursuant to 28 U.S. Code § 1332 because the cause of action is between citizens of different States and the amount in controversy exceeds the statutory minimum. This court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367. Venue is proper in the eastern division pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to plaintiffs' claims arose or occurred in this division.

## PARTIES

2.      Plaintiff,  Dyllan M. Rives, an individual, is a resident of Oconee County, Seneca, South Carolina.

3.      Plaintiff, James R. Rives, an individual, is a resident of Marshall County, Scottsboro, Alabama.

4.      Hickory Dean Rives (Hickory), a Canine, now decease, was a resident of Marshall County, Scottsboro, Alabama.[1]

---

[1]Hickory was the beloved family member of Dyllan M. Rives, and as such a family member collectively of the "Rives", who reside in Marshall County, Alabama. Although a beloved family member Hickory was considered property under the laws of the United States, and as such he was the personal property of Dyllan M. Rives.

2

5. University of Tennessee, a quasi-governmental corporation doing business in Knoxville, Tennessee.

6. Defendant, Donde Plowman, an individual and in her individual capacity as the Chancellor of the University of Tennessee.

7. Defendant, University of Tennessee College of Veterinary Medicine (UTCVM), is a quasi-governmental corporation doing business in Knoxville, Tennessee.

8. Defendant, James Thompson, an individual and in his individual capacity as the Dean of the UTCVM.

9. Defendant, John and Ann Tickle Small Animal Hospital (UTSAH), is a quasi-governmental corporation doing business in Knoxville, Tennessee.

10. Defendant, Juergen Schumacher (Schumacher), an individual and in his individual capacity as Department Head of Small Animal Clinical Sciences of UTCVM.

11. Defendant, Leslie Wereszczak (Wereszczak), an individual and in her individual capacity as Director of Emergency and Critical Care at UTCVM/UTSAH.

12. Defendant, Kimberly Anderson, an individual, is a Clinical Assistant Professor of Neurology, Small Animal Clinical Sciences at UTCVM/UTSAH.

13. Defendant, Virginie Wurlod-Talbot (Wurlod), an individual, is an Assistant Professor of Small Animal Emergency and Critical Care at Louisiana State University (LSU) School of Veterinary Medicine.

14. Defendant, Caitlin McManemon, an individual, is a resident in the Department of Neurology, Small Animal Clinical Sciences at UTCVM/UTSAH.

15. Defendant, Brett Hogberg, an individual, is a resident in the Department of Small Animal Clinical Sciences at UTCVM/UTSAH.

3

16.     Defendant, Jack Lee, an individual, is a resident in the Department of Small Animal Clinical Sciences at UTCVM/UTSAH.

## FACTS

17.     On January 4, 2022, Hickory was seen on home video injuring himself in his kennel.

18.     On January 5, 2022, Hickory was taken to his primary care veterinarian at Phillips Small Animal Clinic (PSAC), 19855 John T. Reid Parkway, Scottsboro, AL 35768.

19.     At Hickory's initial visit with PSAC, he was diagnosed as having a pinched nerve, and was given a shot of prednisone along with a prescription for doxycycline and prednisone with directions to bring him back if his condition worsened.

20.     On January 8, 2022 Hickory began having trouble eating due to excessive frothy salivation.

21.     On January 8, 2022, PSAC was contacted regarding Hickory's condition, but PSAC was unable to see him due to weekend scheduling.

22.     A referral was requested from PSAC.

23.     On January 10, 2022, Hickory was seen by Dr. Melissa Mays at VCA Regional Institute for Veterinary Emergencies and Referrals (VCA), 2132 Amnicola Highway, Chattanooga, Tennessee.

24.     On January 11, 2022, VCA referred Hickory to UTCVM for Magnetic Resonance Imaging (MRI).

25.     On January 11, 2022, Caitlin McManemon (McManemon), a resident of UTCVM working at UTSAH diagnosed Hickory as having Myasthenia Gravis (MG), an

immune-mediated neuromuscular condition based on a neurological exam and a positive Tensilon Test.[2]

26. Myasthenia gravis is a condition seen in people as well as animals with an approximate incidence rate of between 14-40 per 100,000 people in the United States. Myasthenia Gravis - NORD (National Organization for Rare Disorders) (http://rarediseases.org).

27. There is no known isolated cause of MG. Generally, MG is considered to be idiopathic in nature, but MG can also be iatrogenic (medically induced or caused by examination or treatment). Mehyar Mehrizi MD, Rodrigue F. Fontem MS, Tiffany R. Gearhart MS, and Robert M. Pascuzzi, MD Department of Neurology Indiana University School of Medicine: Medications and Myasthenia Gravis (A Reference for Health Care Professionals). https://myasthenia.org/portals/0/draft_medications_and_myasthenia_gravis_for_MGFA_ website_8%2010%2012.pdf.

28. At Dyllan Rives' request McManemon viewed the video of Hickory injuring himself in his kennel, but McManemon said it did not change her diagnosis. Hickory was admitted to the Emergency Critical Care (ECC) unit at UTSAH/UTCVM.

_____

[2]A Tensilon test is a diagnostic test used to evaluate myasthenia gravis (MG), a neuromuscular condition. To test for MG, Hickory was given edrophonium, a fast-acting short lived reversible acetylcholinesterase inhibitor (ChEI) that acts by increasing acetylcholine at the neuromuscular junction (NMJ). Naji A, Owens ML. Edrophonium. [Updated 2021 Jul 17]. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2022 Jan-. Available from: https://www.ncbi.nlm.nih.gov/books/NBK554566/. The neuromuscular junction, synapse, also called neuronal junction, is the site of transmission of electric nerve impulses between two nerve cells (neurons) or between a neuron and a gland or muscle cell (effector). https://www.britannica.com/science/neuromuscular-junction

29.     On or about January 11 or 12, 2022, Dyllan Rives suggested a computed tomography (CT or CAT) scan in lieu of the MRI, but UTSAH and McManemon chose not to do either the MRI or CT.

30.     On January 13, 2022, Hickory was discharged with a prescription for pyridostigmine bromide, Mestinon™, at the rate of 1/4 tablet (15 mg) and Augmentin an antibiotic (500 mg tablet) every 12 hours.[3]

31.     Pyridostigmine, similar to edrophonium, is another ChEI, however, pyridostigmine's effects are long acting. Cholinesterase Inhibitors (ChEIs) increase acetylcholine at the NMJ by inhibiting acetylcholinesterase (AChE), the enzyme responsible for breaking down acetylcholine, at the nerve junction or synapse. By inhibiting the enzyme responsible for breaking down acetylcholine the amount of acetylcholine within the synaptic junction is increased. *See* footnote 2 *supra*.

32.     "Taking too much pyridostigmine (Mestinon **can cause muscle weakness**. However, muscle weakness is also a sign of worsening myasthenia gravis." (Emphasis supplied). Pyridostigmine (Mestinon): Basics, Side Effects & Reviews. https://www.goodrx.com/pyridostigmine/what-is

33.     Antibiotics including penicillin and other drugs have been associated with increased myasthenic weakness. https://myasthenia.org/portals/0/draft_medications_and_myasthenia_gravis_for_MGFA_ website_8%2010%2012.pdf; *see also* Vacchiano V, Solli P, Bartolomei I, Lai G, Liguori

_____

[3]An X-ray indicated Hickory had aspiration pneumonia and megaesophagus (a multifaceted condition of the esophagus which affects the ability to move food into the stomach). Accordingly, Hickory was prescribed Augmentin to treat his pneumonia and special feeding instruction were given to address the megaesophagus. Dyllan Rives was instructed to get an X-ray prior to discontinuing Augmentin to make sure the pneumonia resolved.

6

R, Salvi F. Exacerbation of myasthenia gravis after amoxicillin therapy: a case series. Neurol Sci. 2020 Aug;41(8):2255-2257. doi: 10.1007/s10072-020-04387-5. Epub 2020 Apr 15. PMID: 32296986; *see also* ¶ 27 *supra*.

34. "Excessive accumulation of acetylcholine (ACh) at the neuromuscular junctions and synapses causes symptoms of both muscarinic and nicotinic toxicity.[4] These include **cramps, increased salivation, lacrimation, muscular weakness, paralysis, muscular fasciculation, diarrhea, and blurry vision**. (Emphasis supplied). Adeyinka A, Kondamudi NP. Cholinergic Crisis. [Updated 2022 May 2]. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2022 Jan-. Available from: https://www.ncbi.nlm.nih.gov/books/NBK482433/

35. Too much ChEIs can lead to a cholinergic crisis. "A cholinergic crisis develops as a result of overstimulation of nicotinic and muscarinic receptors at the neuromuscular junctions. This is usually secondary to the inactivation or inhibition of acetylcholinesterase (AChE), the enzyme responsible for the degradation of acetylcholine (ACh). Excessive accumulation of acetylcholine (ACh) at the neuromuscular junctions and synapses causes symptoms of both muscarinic and nicotinic toxicity." *Id.*

36. Upon discharge McManemon explained to Dyllan Rives she would be the "eyes and ears" in regards to her (McManemon's) ongoing care of Hickory. McManemon instructed Dyllan Rives to increase the pyridostigmine dose to 1/4 tablet every eight hours beginning January 14, 2022.

---

[4]"The nicotinic receptor is a channel protein that, upon binding by acetylcholine, opens to allow diffusion of cations. The muscarinic receptor, on the other hand, is a membrane protein; upon stimulation by neurotransmitter, it causes the opening of ion channels indirectly, through a second messenger." https://www.britannica.com/science/nicotinic-receptor

37.     McManemon also told Dyllan Rives to increase the pyridostigmine dose to 3/8 tablet (22.5 mg) every eight hours if Hickory showed signs of muscle weakness in the future.

38.     Additional charges for continued consultations and care for Hickory were included.

39.     From January 14, 2022 to January 21, 2022, Hickory did well and tolerated his medications, and McManemon and UTCVM were informed via the email address given at discharge.

40.     On January 25, 2022, per instructions upon discharge, Hickory was seen by VCA for an X-ray prior to discontinuing the Augmentin.

41.     VCA called later in the day to inform Dyllan Rives, the X-ray showed Hickory did not have megaesophagus or pneumonia.

42.     At this visit, VCA gave Dyllan Rives a list of drugs with possible adverse side effects to pyridostigmine. Atropine was on the list as a drug to be used with caution because of the potential for masking a cholinergic crisis.[5]

43.     On January 26, 2022, Hickory was given the last dose of his 14-day Augmentin regimen.

44.     On January 27, 2022 into January 28, 2022, Hickory began having increased salivation and hacking.

---

[5]Atropine is a drug used to treat symptoms of ChEI inhibitor overdose. "Atropine acts as a direct antidote physiologically by **antagonizing the muscarinic receptor's actions of excessive acetylcholine** such as bronchorrhea, bradycardia, salivation, and bronchoconstriction. Atropine can cross the blood-brain barrier and can help decrease the activity of centrally acting excess acetylcholine." (Emphasis supplied) https://www.ncbi.nlm.nih.gov/books/NBK539783/#:~:text=Atropine%20acts%20as%20a%20direct,of%20centrally%20acting%20excess%20acetylcholine

45. On January 28, 2022, McManemon and Dyllan Rives exchanged emails regarding Hickory's X-ray results, the megaesophagus, the increased salivation, and concerns about the possibility Hickory was receiving too high a dose of pyridostigmine.

46. On January 29, 2022, Dyllan Rives sent an email to UTSAH/UTCVM and McManemon at the email address given upon discharge expressing multiple concerns over Hickory's ever increasing muscle weakness. In the email, Dyllan Rives created a link to a Google folder sharing videos of Hickory's increasing weakness.

47. On January 30, 2022, without feedback from McManemon and UTSAH/UTCVM for several days, Dyllan Rives, per McManemon's oral instructions upon discharge increased the pyridostigmine dose to 3/8 of a tablet (22.5 mg) every eight hours.

48. On January 31, 2022, Dyllan Rives sent an email regarding the increase in muscle weakness exhibited by Hickory.

49. On February 2, 2022, after five days without hearing from UTSAH/UTCVM, Dyllan Rives finally received a response from McManemon.

50. McManemon's recommendation was to continue to give pyridostigmine at the rate of 1/2 tablet (30 mg) every eight hours despite Hickory's increased weakness with the increase in pyridostigmine dose.

51. Because Hickory had been doing good prior to stopping Hickory's Augmentin, Dyllan Rives requested a prescription.

52. Later on, February 2, 2022, after giving two (1/2 tablet (30 mg)) doses as McManemon recommended, Hickory's condition deteriorated significantly. Dyllan Rives emailed a video to McManemon expressing her ever increasing concerns.

9

53. Still later on, February 2, 2022, Dyllan Rives telephoned UTCVM's emergency department asking for help regarding Hickory's symptoms and ever-increasing decline.

54. A resident at UTCVM's emergency department returned Dyllan Rives' call advising her to return to the original pyridostigmine dose 3/8 of a tablet.

55. The instruction was unclear, however, as the original dose was 1/4 of a tablet given every 12 hours, so Dyllan Rives reduced the pyridostigmine to 1/4 tablet (15 mg).

56. The UTSAH technician informed Dyllan Rives the prescription for Augmentin was sent to the pharmacy as she (Dyllan) requested, but if it helped, Hickory would need to be seen by an internalist because Hickory's condition was no longer neurological in nature.

57. On February 3, 2022, Dyllan Rives and an on-call technician at UTSAH exchanged telephone calls regarding Hickory's deteriorating condition.

58. In the late evening of February 3, 2022, into the early morning hours of February 4, 2022, Hickory experienced a cholinergic event with heavy salivation, gastric upset, and tearing, signs of a ChEIs overdose.

59. Dyllan and Elisa Rives gave Hickory all night nursing care, and by morning the extreme salivation episode was beginning to ease, and Hickory was breathing better.

60. On February 4, 2022, Dyllan Rives spoke to a technician at UTSAH who instructed Dyllan Rives to bring Hickory back to UTCVM before noon.

61. Hickory was readmitted to UTSAH for an adjustment to his pyridostigmine dose, and UTSAH called for a $1000 dollar deposit.[6]

62. Later on, February 4, 2022, McManemon telephoned Dyllan Rives advising Hickory had aspiration pneumonia again, but it was not as bad as it was in January.

63. McManemon said it was best for her to titer Hickory's medication at UTSAH because "they" (UTCVM) had atropine and suctioning, and because Dyllan Rives needed rest.[7]

64. McManemon said she was going to "challenge" Hickory by not giving him pyridostigmine for 24 hours.

65. On the morning of February 5, 2022, McManemon telephoned Dyllan Rives to inform her Hickory's condition had deteriorated without pyridostigmine, and informing Dyllan Rives she (McManemon) was going to give Hickory 1/4 tablet (15 mg).

66. Later around noon (Central Standard Time), February 5, 2022, McManemon telephoned Dyllan Rives informing her Hickory was doing much better since having the pyridostigmine, and McManemon said based on the "challenge" Hickory definitely still needed pyridostigmine.

67. On the evening of February 5, 2022, Dyllan Rives received another telephone call from UTCVM affirming Hickory was responding favorably to 1/4 tablet (15mg).

---

[6] The record contains two fee estimates, one dated February 4, 2022 for $1500 -$2000, for adjustment to medication. The other dated February 13, 2022 for upper end $25000.
[7] To titer is to regulate the amount or concentration of a substance in a system.

68.     Dyllan Rives was told Hickory was much brighter than in the morning with much better strength, and was able to lift his head up and wag his tail.

69.     On Sunday February 6, 2022, either McManemon or a student from UTCVM telephoned with updates on Hickory's condition, and all indications were Hickory was responding favorably to the pyridostigmine dose of 1/4 tablet (15mg) every 12 hours.

70.     The Small Animal Intensive Care Unit (SAICU) record reflects on February 5, 2022 and February 6, 2022, Hickory received 1/4 tablet (15mg) of pyridostigmine at 7:00 a.m. and 7:00 p.m., respectively.

71.     The SAICU Additional Notes for February 6, 2022, at 1:30 p.m. state: "$\overline{P}$ walked well on own with no support made it to the scale before getting a bit ataxic walked from scale to ICU with little support – stopped and didn't want to walk in ICU was able to stand with no support for over a minute".

72.     At 11:00 p.m. SAICU notes state: "walked $\overline{p}$ out around lab area then to tx 1 & back, he walked well w/ minimal support till tx 3, though I think a lot of it was stubbornness. We gave him a couple of breaks which he rallied after, but lasted shorter times, though once he saw his cage, he was able to walk towards it on his own."

73.     At 3:00 a.m. SAICU states: "Walked around ICU this time clockwise direction. He made it 1 1/4 times around with minimal assistance then rested for 10-20 sec. then made it 1/2 way around then had to rest for 10-20 sec. then only just made it the last 1/4 way to cage before needing to rest."

74.     During one call on Sunday, February 6, 2022, McManemon recommended Hickory be given prednisone (an immunosuppressant), a CT scan[8], a thyroid check, and another antibody test. Dyllan Rives expressed concerns to McManemon about giving prednisone because Hickory had had an earlier adverse reaction, but McManemon insisted.[9] *See* ¶¶ 19-20 *supra*.

75.     McManemon on February 7, 2022, despite Hickory responding well to the pyridostigmine dose of 1/4 tablet every 12 hours, increased Hickory's dosage of pyridostigmine to 1/4 tablet every eight hours, and added prednisone.

76.     Hickory received pyridostigmine at 7:00 a.m., 4:00 p.m. and 11:00 p.m. The SAICU notes for 11:00 p.m.: ". . . noted tearing OS & some nasal discharge, let Dr. Mac know. No Δ now, continue w/ same pyridostigmine dose for now."

77.     On the morning of February 8, 2022, Dyllan Rives received a telephone call from a UTCVM student involved with Hickory's care with an update that Hickory was neurologically doing great and able to walk in and out on his own without assistance at 3:00 a.m., and that Hickory would be in the Neurological treatment room all day for observation prior to going home.

78.     The SAICU for February 8, 2022 at 5:40 p.m. states: "p̄ has been in TR all day. Lethargic, sleeping all day, not wanting to lift head much. Still good appetite, but won't lift head readily to eat. Has had lacrimation (…). Brief cough this AM but none since. Very weak, and has to be supported at all times today. At 5:30 pm, had to rest after

---

[8]Although Dyllan Rives had given permission for a CT scan, it was never done even though Hickory was fasted on February 6, 2022 in preparation for the procedure.
[9] Prednisone is known to be a cause of increased muscle weakness in patients with MG. https://myasthenia.org/portals/0/draft_medications_and_myasthenia_gravis_for_MGFA_website_8%2010%2012.pdf

5-10 steps, hanging head low, knuckling both FLS. Concerned for SLUD signs, too much pyrido. Plan to ↑ prednisone & ↓ pyrido back to q12h but at higher dose tomorrow."

79.    On the evening of February 8, 2022, McManemon telephoned with the evening update informing Dyllan Rives that Hickory had slept most of the day while in the Neurological treatment room. McManemon said something to the effect "I think we just need to play with his dose." Concerned, Dyllan Rives asked whether Hickory was showing early signs of another cholinergic crisis, and McManemon responded "I don't think so."

80.    On the morning of February 9, 2022, the SAICU record states for 3:00 a.m.: "Unable to walk, stood for short period then slid to lay down. Carried outside, no interest in attempting to urinate/defecate. At 7:12 a.m. "found $\overline{P}$ w/ large bit of $D^+$, urine, and foaming from the mouth. Called Dr. Mac & she came to evaluate him (Hickory). Per Dr. Mac likely a SLUD reaction to Pyridostigmine after not having it for 14 hrs. …"

81.    "Excessive use of acetylcholinesterase inhibitors (AChEI) in the treatment of a patient with MG may precipitate a cholinergic crisis which is characterized by both muscarinic and nicotinic toxicity" Lacomis D. Myasthenic crisis. Neurocrit Care. 2005;3(3):189-94. PubMed: 16377829.

82.    On the morning of February 9, 2022, McManemon telephoned informing Dyllan Rives atropine had to be administered because according to McManemon someone in ECC gave Hickory 3/8 of a tablet (22.5 mg) of pyridostigmine before she (McManemon) had been able to examine Hickory.

83.    Clinician's Orders (CO) for February 9, 2022: Addendum 9:15 a.m.: "D/C Pyridostigmine.  Atropine 0.5 mg IV given at 8:45 a.m."

84.     There are "[t]wo types of antidotes . . . used for a cholinergic crisis: atropine and oximes. . . The first antidote is atropine. It is an effective agent for the muscarinic effect of acetylcholine…" Adeyinka A, Kondamudi NP. Cholinergic Crisis. [Updated 2022 May 2]. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2022 Jan-. Available from: https://www.ncbi.nlm.nih.gov/books/NBK482433/

85.     McManemon without expressing concern said Hickory was cribbed and on oxygen.

86.     McManemon, without going into details about Hickory's condition, said Hickory was feeling well enough to push the oxygen mask away from his face.

87.     In the early evening of February 9, 2022, McManemon telephoned regarding Hickory's condition.

88.     Dyllan Rives informed McManemon, she was on her way to pick up Hickory to take him to North Carolina State University where he could receive Therapeutic Plasma Exchange (TPE).[10]

89.     McManemon mentioned wanting to place a Nasal Gastric Tube (NGT).

90.     McManemon said she did not know about transporting a patient on oxygen, but Dyllan Rives explained she had an oxygen machine and asked McManemon to write a referral.

91.     McManemon said she would write the referral, but the record does contain a referral to NC State.

---

[10]TPE, also known as plasmapheresis, removes and replaces a patient's blood plasma to treat certain immune mediated diseases like MG.

92.     Around 1:00 a.m. in the morning of February 10, 2022, Dyllan Rives received a telephone call from McManemon.

93.     Throughout the time McManemon was in charge of Hickory, Dyllan Rives had repeatedly been told, "no news is good news", so the call around 1:00 a.m. in the early morning terrified her (Dyllan Rives), and she screamed upon answering "no, no, no, no".

94.     When Dyllan Rives finally calmed a little, McManemon said Hickory is alive, but he is not doing well.

95.     McManemon told Dyllan Rives Hickory's oxygen levels were dropping and his carbon dioxide levels were rising.

96.     McManemon, stating ventilation was a matter of life or death, wanted to know if she (Dyllan Rives) would agree to Hickory being placed on a ventilator.

97.     Dyllan Rives, still shaken, responded yes, she would agree to Hickory being placed on the ventilator to save his life.

98.     The SAICU record reflects Jack Lee (Lee), an ECC attending resident, in coordination with McManemon gave Hickory neostigmine multiple times after McManemon called Dyllan Rives at 1:00 a.m. (EST).

99.     The SAICU notes for February 10, 2022 at 5:00 a.m. state: "$SPO_2$ 97-99 when flat probe pressed on base of tail. Hypersalivation has seemed to have decreased over the last few hours, mouth still needs to be suctioned. MM color is better-more pink than before. At 4:00 am drank 24 ml of water from syringe very well…. At 5:10 drank another 50 ml of water from syringe very well …At 7:26 am: Per Dr. Mac gave a second dose of Neostigmine 0.99 mg SQ…."

100.    Neostigmine is another ChEI, which increases acetylcholine by inhibiting acetylcholinesterase.

> Cholinergic toxicity is caused by medications, drugs, and substances that stimulate, enhance or mimic the neurotransmitter acetylcholine. Acetylcholine is the primary neurotransmitter of the parasympathetic nervous system. Acetylcholine stimulates muscarinic and nicotinic receptors to cause muscle contraction and glandular secretions. Cholinergic toxicity occurs when too much acetylcholine is present in the receptor synapse leading to excessive parasympathetic effects. . . **Cholinergic drugs may cause a cholinergic crisis during clinical use or after an overdose**. These drugs include drugs used to treat myasthenia gravis such as edrophonium and **neostigmine** . . . Essentially, any agent that creates an abundance of acetylcholine at the synapse may cause cholinergic toxicity. **These drugs may cause weakness, but a cholinergic crisis is very rare with drugs taken at therapeutic doses.** (Emphasis                                                          supplied). https://www.ncbi.nlm.nih.gov/books/NBK539783/#:~:text=Atropine%20a cts%20as%20a%20direct,of%20centrally%20acting%20excess%20acetylc holine.

101.    Around 8:20 a.m. on February 10, 2022, less than an hour after McManemon directed Hickory be administered another dose of neostigmine, Dyllan Rives received another call from McManemon.

102.    McManemon said Hickory was not yet on the ventilator, but ECC wanted Dyllan Rives to come see Hickory before he went on the ventilator because only 10 to 15 percent with pneumonia come off the ventilator.

103.    McManemon did not mention a cholinergic crisis.

104.    Dyllan and Elisa Rives arrived at UTCVM around 8:45 a.m. and were escorted by McManemon and a student to the ECC to see Hickory.

105.    Lee, the ECC resident, explained possible complications in regards to ventilation, while McManemon stressed ventilation was a life-or-death choice. UTSAH/UTCVM was forcing Dyllan Rives to make the first of many Hobson's choices.

106.     Hickory, experiencing severe respiratory distress, had excessive salivation with slobber coming out of his mouth and nose. *See* footnote 11 *infra*.

107.     Hickory, heartbreakingly, responded to both Dyllan and Elisa Rives by wagging his tale, standing and begging to go home.

108.     Shortly after the visit UTCVM called for a deposit of $6500 dollars bringing the total deposit to $7500.

109.     Dyllan Rives' practice when receiving telephone calls from McManemon and UTCVM was first and foremost to ask "how is Hickory"?

110.     Dyllan Rives always inquired extensively into Hickory's condition.

111.     Once Hickory went on the ventilator, Dyllan Rives' inquiries became more extensive, inquiring about ventilator settings, vital signs, whether or not Hickory was experiencing any SLUD signs,[11] asking when she (Dyllan Rives) could visit Hickory, and when Hickory would be weaned from the ventilator.

112.     On February 10, 2022, in the evening, McManemon telephoned Dyllan Rives and informed her Hickory was loving the ventilator.

113.     McManemon relayed Hickory's vital signs such as blood pressure, heart rate, respiratory rate, blood gas levels such as oxygen and carbon dioxide etc., and ventilator settings.

---

[11]Signs of ChEIs overdose are referred to as (SLUD) signs **S**alivation **L**acrimation **U**rination **D**iarrhea. Lott EL, Jones EB. Cholinergic Toxicity. [Updated 2022 May 15]. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2022 Jan. Available from: https://www.ncbi.nlm.nih.gov/books/NBK539783/

114.   McManemon told Dyllan Rives that Hickory was on neostigmine at the lowest possible dose to prevent respiratory collapse or paralysis, and Hickory would be switched to pyridostigmine later.

115.   Dyllan Rives asked McManemon if neostigmine had more side effects than pyridostigmine, and McManemon said "no".

116.   Dyllan Rives asked about the possibility of using injectable pyridostigmine and McManemon said "they" (UTSAH) use neostigmine.

117.   Relying on McManemon's statement about pneumonia, Dyllan Rives inquired about Hickory's pneumonia.

118.   McManemon said the X-ray done when the nasal gastric tube (NGT) was placed showed Hickory's pneumonia was the same.

119.   Dyllan Rives inquired as to whether the X-ray showed Hickory still had megaesophagus? McManemon said "nope".

120.   McManemon said Hickory had received Intravenous Immunoglobulin (IVIG) therapy, and the effects would take 48 hours at the earliest.[12]

121.   McManemon had mentioned IVIG therapy to Dyllan Rives prior to Hickory going on the ventilator commenting IVIG would have been pointless if Dyllan Rives had taken Hickory for TPE.

122.   McManemon never asked Dyllan Rives for explicit approval to give the IVIG.

123.   McManemon said ECC had suggested an endotracheal tube wash and culture.

---

[12]Intravenous immunoglobulin ("IVIG") is a product made up of antibodies that can be given intravenously to alleviate symptoms for immune disorders.

124.    Dyllan Rives discussed with McManemon the possibility Hickory had gone into remission, but McManemon, referring to the "challenge" said Hickory was weak when he went without pyridostigmine for 26 hours. *See* ¶¶ 64-65.

125.    Dyllan Rives said she wanted to see Hickory twice a day regardless of sedation, and McManemon responded it was up to ECC.

126.    On February 11, 2022, McManemon in her morning telephone call relayed Hickory's vitals and ventilator settings, and that Hickory's test for antibodies, used to confirm the diagnosis of MG, was negative as was the thyroid test.[13]

127.    McManemon said several additional diagnostics were being suggested including an Addison's test, a CT scan, and an electrodiagnostic test, saying "they" (McManemon and ECC) were grasping for straws.

128.    McManemon said she did not recommend the Addison's test because Hickory's blood work was not consistent with Addison's disease.

129.    Dyllan Rives agreed to the electrodiagnostic test.

130.    Dyllan Rives declined the request for a CT scan because she had already agreed to a CT two times before without a CT being done, and because the focus now was on getting Hickory off the ventilator. *See* ¶¶ 29, 74.

131.    Dyllan Rives, still relying on McManemon's statement about pneumonia, asked "when will they (ECC) try to wean him" when the pneumonia clears or sooner? McManemon's response to Dyllan Rives was ECC was beginning the weaning process.

---

[13]Anti-acetylcholine receptor antibody test is used to confirm the diagnosis of MG. Myasthenia Gravis - NORD (National Organization for Rare Disorders) (http://rarediseases.org); *see also* ¶ 26.

132.    Dyllan Rives ask "when can we come see him (Hickory)", and the response was not right now.

133.    On February 11, 2022, during the evening update Dyllan Rives asked McManemon "when is he going to be weaned?" McManemon replied the ECC critical specialist is planning to wean him (Hickory) off tomorrow.

134.    After Hickory's vitals had been discussed the remaining discussion between McManemon and Dyllan Rives concerned the results of the electrodiagnostic test, which confirmed a lower neuromuscular condition.

135.    Dyllan Rives, still laboring under the misrepresentation by McManemon, inquired specifically about Hickory's pneumonia, and was told it was about the same.

136.    On the evening of February 12, 2022, Lee a resident in the ECC, telephoned with Hickory's update.

137.    Lee said Hickory's oxygen and carbon dioxide numbers were adequate on the ventilator.

138.    Lee relayed there had been some positives and negatives in regards to Hickory's ventilation explaining Hickory had experienced some clogging issues with the endotracheal tube, but once the tube had been cleared Hickory's breathing on the ventilator returned to its previous stable state.

139.    Lee identified the secretions causing the clogging as secretions due to pneumonitis and the ventilator (not pneumonia).

140.    Lee said Hickory was taking a lot of spontaneous breaths, some assisted breaths, and the ventilator was providing fewer mandatory breaths.

141. Lee, also indicated Hickory was making progress towards being extubated off the ventilator, but it was a process.

142. Lee explained he gave Hickory two fifteen-minute breathing trials "without ventilation" where Hickory was able to breath on his own with Hickory's oxygen and carbon dioxide levels remaining in the normal range.

143. Elisa Rives asked if it was in fact harder to breathe through the ventilator apparatus, and Lee said yes it was harder for Hickory to breathe through the endotracheal tube, saying he was encouraged.

144. Lee also said he did not want to fatigue Hickory as it was the weekend, and he was by himself.

145. UTSAH/UTCVM personnel did not assertively push Hickory towards being weaned off the ventilator over weekends always asserting there was no one there to assist. *See* ¶¶ 144, 159.

146. On the morning of February 13, 2022, McManemon telephoned with Hickory's morning update.

147. McManemon said Hickory's oxygen levels had dropped in the early morning, but the endotracheal tube had been cleared and oxygen levels stabilized.

148. McManemon said Hickory, the day before, had neostigmine with no side effects, but after Hickory was given neostigmine at 7:00 a.m. this morning (Sunday), he had some diarrhea and some tearing at 8:00 a.m.

149. McManemon said she could not confirm it was due to neostigmine.

150. McManemon said Hickory was off the opioids, but still on propofol and dexmedetomidine, and IV nutrition was started yesterday.

151. McManemon then requested another $5000 dollar as payment towards UTSAH's custody of Hickory saying the money was "to keep the business office off her back."

152. During this telephone call, while the telephone was on speaker, Elisa Rives made the statement "while we support Hickory, a blank check was not being written for any additional mistakes", wherein a back-and-forth exchange between McManemon and Elisa Rives regarding Hickory's need to be put on a ventilator ensued.

153. McManemon said Hickory required ventilation because he (Hickory) was exhausted denying Hickory had been given too much pyridostigmine and/or neostigmine. *See* ¶¶ 82, 98, 99, 101.

154. Elisa Rives responded atropine is given to counteract the effects of too much pyridostigmine (ChEIs) not too little. *See* ¶¶ 63, 82-84 and footnote 5.

155. This was the last time Dyllan Rives heard from McManemon.

156. Dyllan Rives did not hear from anyone in neurology until February 15, 2022.

157. A call from the UTSAH/UTCVM business office followed requesting the $5000 dollars bringing the total to $12500 for an estimated cost of $25000 dollars. *See supra* footnote 6.

158. That evening on February 13, 2022, a resident in the ECC, Brett Hogberg (Hogberg) telephoned with the evening update indicating Hickory had experienced additional clogging of the endotracheal tube, but the issue had been successfully resolved.

159. Hogberg said he had done only one breathing trial "without ventilation" for ten to twelve minutes explaining he did not want to push Hickory in light of the

weekend and because Hickory was moving towards being extubated in the morning. *See* ¶¶ 144-145.

160.    Hogberg said Hickory was on 40% oxygen, which was considered a low oxygen setting, which was good.

161.    When Dyllan Rives asked about whether Hickory was experiencing SLUD signs, Hogberg said "no", and Hickory would receive neostigmine at 7:00 p.m.

162.    On February 14, 2022, Dyllan Rives became very stressed when there was no morning update.

163.    Around 1:00 p.m. an ECC resident, Mariola Rak (Rak) telephoned, she said her name was "Rak" like "Mac".

164.    Rak relayed Hickory was stable on the ventilator, however, Hickory was taking very few spontaneous breaths.

165.    Dyllan Rives, relying on McManemon's, Lee's and Hogberg's reports over the weekend, was expecting to hear Hickory was off the ventilator. *See* ¶¶ 131, 133, 141, 159.

166.    Rak said Hickory was just not responding to neostigmine so no more was given after 7 a.m. Sunday, February 13, 2022.

167.    Dyllan Rives was completely blindsided given her discussion with Hogberg the previous evening. *See* ¶ 161.

168.    McManemon had previously declared to Dyllan Rives, Hickory needed ChEIs (neostigmine/pyridostigmine) based on the "challenge". *See* ¶¶ 64, 65, 124.

169.     McManemon had previously told Dyllan Rives, Hickory was on the smallest dose possible of ChEIs (neostigmine/pyridostigmine) to prevent respiratory collapse. *See also* ¶ 114.

170.     McManemon had said she did not know if Hickory's diarrhea and tearing on Sunday were due to neostigmine (ChEI). *See* ¶ 149.

171.     Based on statements made to Dyllan Rives, McManemon knew taking Hickory off ChEIs completely would cause Hickory to go into respiratory decline and/or respiratory collapse. *See* ¶¶ 64-65, 114, 124.

172.     In patients with MG, treatment with ChEIs is a balance. While ChEIs are necessary to prevent symptoms of myasthenia crisis such as respiratory collapse, too much ChEIs can lead to a cholinergic crisis.

> Patients with MG can present with acute weakness either because they have too much medication (resulting in a cholinergic crisis) or because of an exacerbation of their myasthenia, usually secondary to an acute illness or stress (myasthenic crisis), which results in not enough anticholinesterase inhibitor. Hogan, Christopher et al. Acute Myasthenia Crisis: A Critical Emergency Department Differential. *Cureus* vol. 12,8 e9760. 15 Aug. 2020, doi:10.7759/cureus.9760; *see also* https://www.ncbi.nlm.nih.gov/books/NBK539783/#:~:text=Atropine%20a cts%20as%20a%20direct,of%20centrally%20acting%20excess%20acetylc holine.

173.     Dyllan Rives knew McManemon was misrepresenting facts in regards to Hickory's condition.

174.     Rak said the tracheal wash indicated nothing was growing.

175.     Rak then started recommending a plethora of procedures some of which had been discussed with McManemon and declined, including a CT scan and an Addison's test.

176.   Rak said she wanted to try a lower dose of neostigmine, and "they" (ECC) wanted to do a tracheal tube to replace the endotracheal tube.

177.   Dyllan Rives requested an in-person meeting with the person or people in charge of the ECC.

178.   Dyllan and Elisa Rives met with Virginie Wurlod-Talbot (Wurlod), a visiting ECC critical specialist, and Rak.

179.   When Wurlod was asked if she had a supervisor, she said she did not, and mysteriously Schumacher, the Department Head of UTSAH appeared and joined the meeting.

180.   At some point, Dyllan Rives stated Hickory was on the ventilator because of a cholinergic crisis and not because of pneumonia, and Wurlod and Rak nodded in agreement.

181.   McManemon had misrepresented why Hickory needed ventilation. *See* ¶¶ 102-103, 153.

182.   This misrepresentation/deception/lie had led to the back and forth between McManemon and Elisa Rives during the call on the morning of February 13, 2022.

183.   When Elisa Rives confronted McManemon she refused to acknowledge Hickory went into a cholinergic crisis. *See* ¶ 153.

184.   Wurlod said she had met with the residents, Lee and Hogberg, and Hickory was never given an independent breathing trial without ventilator support.

185.   Wurlod said Lee and Hogberg told her the breathing tests had always been with pressure support, and Hickory was no longer breathing well. *But see* ¶¶ 141-143, 159-160.

186.    The SAICU record on February 13, 2022, says patient: "breathed on his on during trial without ventilation by Dr. Hogberg earlier".

187.    Everything Wurlod and Rak were saying was contrary to everything Dyllan Rives had been told by McManemon, Lee and Hogberg when she had asked about Hickory. *See* ¶¶ 114-161.

188.    Whenever, Dyllan Rives expressed concerns about misrepresentations/deception/lies in regards Hickory's care and state, both Wurlod and Rak's responses were repeatedly "I (we) cannot speak to what happened before I (we) came on the case".

189.    Ironically, Wurlod and Rak, speaking about things that had happened before they started in the ECC, said Hickory had been experiencing adverse reactions to neostigmine all along.

190.    The SAICU record does not reflect Hickory was experiencing SLUD and/or adverse reactions to neostigmine.

191.    Dyllan Rives had specifically and repeatedly asked and been told by McManemon, Lee and Hogberg, Hickory was showing no SLUD signs or adverse responses to neostigmine. *See* ¶¶ 149 and 161.

192.    At some point, Elisa Rives asked Rak and Wurlod if Hickory could be switched to injectable pyridostigmine instead of neostigmine because it has fewer side effects, and Rak replied "no such drug exists".

193.    Schumacher said Wurlod and Rak would be attending to Hickory for the next two weeks, which was not reassuring to Dyllan Rives.

194. Dyllan Rives was left with another Hobson's choice, agree to a lower dose of neostigmine and continued ventilation or kill Hickory.

195. Elisa Rives stressed to Wurlod, Rak and Schumacher, the goal was to get Hickory off the ventilator as soon as possible. Hickory's ventilation would be extended for another 17 days.

196. After the meeting on, February 14, 2022, Elisa Rives telephoned and found a pharmacy with injectable pyridostigmine, Regonol™.

197. Elisa Rives telephoned Schumacher leaving a voice mail explaining why there was distrust. Elisa Rives used as an example, the fact that Rak had emphatically stated pyridostigmine did not come in injectable form, when a quick Google search confirmed Regonol™ (injectable pyridostigmine) was readily available at a local pharmacy.[14]

198. Schumacher did not reply.

199. On the evening of February 14, 2022, Rak said Hickory was not doing as well as Saturday, but he was taking more spontaneous breaths since he was given neostigmine at 3:00 p.m.

200. Rak said Hickory had done one breathing trial where he was breathing on his own with pressure support for five minutes.

201. On February 15, 2022, Rak called again and communications once again fell apart when she continued to demand the same procedures and diagnostic tests, which had already been declined.

202. Dyllan Rives requested another in-person meeting.

---

[14]Elisa Rives relied on the single example instead of going into the plethora of misrepresentations/deception/lies regarding Hickory's handling.

203.    Upon arriving at UTSAH, Dyllan and Elisa Rives were met by a social worker Andrew Lufkin (Lufkin) and escorted into a UTSAH room.

204.    At some point, Lufkin left and Schumacher, Wurlod, and Kimberly Anderson (Anderson) a professor in neurology came into the room. It had been more than 48 hours since Dyllan Rives had heard from anyone in neurology.

205.    Anderson stated it was her understanding Hickory was not responding to medication, and Dyllan Rives said "no" that was not true.

206.    After some discussion, a plan was discussed with the understanding Hickory's MG needed to be addressed. Anderson agreed to write a prescription for injectable pyridostigmine, and the plan was for Hickory to stay on neostigmine until Hickory could be switched over.

207.    Dyllan Rives distraught and frustrated suggested possibly trying Mycophenolate Mofetil (MMF).[15]

208.    Anderson agreed with trying the MMF.

209.    When Wurlod said something about costs and time, Anderson put her hand up and said we (Anderson and Wurlod) can talk about it.

210.    Schumacher interjected asking Anderson "what's the time line here"?

211.    Schumacher then turning towards Dyllan Rives stated: you can keep him (Hickory) alive on the ventilator indefinitely, but that is not life, at some point you have to consider what's best for Hickory and yourself.

212.    Hickory was admitted to UTSAH/UTCVM to have his medication adjusted, and "but for" McManemon, Lee, and other defendants mishandling of

---

[15] Mycophenolate has been used as a rescue agent to treat immune-mediated MG.

Hickory's medication ventilation would not have been necessary. *See* ¶¶ 63-65, 83, 98, 100.

213.    Schumacher, an administrator of UTSAH/UTCVM, was now coercing Dyllan Rives to kill Hickory.

214.    Dyllan Rives responded "there is no time line".

215.    Anderson said MMF had been known to work within 24 to 48 hours.

216.    Dyllan and Elisa Rives left with the impression there was a plan to coerce Dyllan Rives to kill Hickory to cover up what McManemon, Lee, Hogberg and others had done which resulted in Hickory going into a cholinergic crisis.

217.    Immediately upon leaving the meeting, Dyllan Rives requested all Hickory's records.

218.    Dyllan Rives, from this point forward, requested and received electronic copies of updated records regularly via email, and on February 28, 2022, Pam Brock, an administrator in charge of records, hand-delivered a printed version of the record through February 27, 2022.

219.    None of the electronic nor printed records turned over to Dyllan Rives up to February 28, 2022 contained incident reports and/or case summaries detailing events leading up to Hickory being administered atropine on February 9, 2022, nor Hickory requiring ventilation as a matter of life or death on February 10, 2022.

220.    Dyllan and Elisa Rives went to Ingles' pharmacy with the prescription for Reginol™, but the pharmacist explained she could not justify ordering a case, ten vials, when the prescription was for only two.

221.    Accordingly, the pharmacist called UTSAH and got Anderson to change the prescription from two vials to ten vials to make it possible to fill the order.

222.    Lee, during the evening update of February 15, 2022, said the breathing trial last night with pressure support was four minutes, and the breathing trial yesterday morning with pressure support was ten minutes.

223.    Lee, stressing Hickory's respiratory decline, said during the breathing trial this morning there were no spontaneous breaths at all, and Hickory was the worse so far.

224.    Lee said Hickory would get MMF at 9:00 p.m., and they would do a blood profile.

225.    Lee also said Hickory's GI motility was not good.[16]

226.    McManemon had ordered ECC to stop giving neostigmine on February 13, 2022, and it was not until the late afternoon of February 14, 2022, when Hickory started receiving a lower dose of neostigmine. *See* ¶¶ 166, 199.

227.    Discontinuing treatment with ChEIs in MG patients can lead to a MG crisis prolonging the need for ventilation.  Wendell, Linda C, and Joshua M Levine. "Myasthenic crisis." *The Neurohospitalist* vol. 1,1 (2011): 16-22. doi:10.1177/1941875210382918; Hogan, Christopher et al. Acute Myasthenia Crisis: A Critical Emergency Department Differential. *Cureus* vol. 12,8 e9760. 15 Aug. 2020, doi:10.7759/cureus.9760; *see also* ¶ 169 *supra*.

---

[16]GI refers to Gastrointestinal: An adjective referring collectively to the stomach and small and large intestines. https://www.merriam-webster.com/dictionary/gastrointestinal%20tract
Neostigmine has been reported to affect GI motility.  Parthasarathy G, Ravi K, Camilleri M, Andrews C, Szarka LA, Low PA, Zinsmeister AR, Bharucha AE. Effect of neostigmine on gastroduodenal motility in patients with suspected gastrointestinal motility disorders. Neurogastroenterol Motil. 2015 Dec;27(12):1736-46. doi: 10.1111/nmo.12669. Epub 2015 Sep 20. PMID: 26387781; PMCID: PMC4659742.

31

228. Lee said Hickory was retaining water and his sodium levels were down and the plan was to give diuretics. Lee also confirmed the IV pyridostigmine would be started the next day if the injectable pyridostigmine was delivered, and Hickory would remain on neostigmine until then.

229. On February 16, 2022, Dyllan and Elisa Rives met with Wurlod and the Clinical Care Director Leslie Wereszczak (Wereszczak).

230. Wurlod recommended getting a consult from a nutritionist implying Hickory was going to be on the ventilator for quite some time.

231. Dyllan Rives declined the nutritionist expressing the need to get Hickory off the ventilator as soon as possible circumventing the need for a nutritionist.

232. Wereszczak then took Dyllan and Elisa Rives back to see Hickory for the first time since he went on the ventilator on February 10, 2022.

233. Wereszczak said she had been attending to Hickory all weekend long.

234. Hickory was heavily sedated and suffering from severe edema, and it was clear Hickory had been in this state for quite some time.

235. It was also clear Hickory had been heavily sedated since going on the ventilator so there had been no reason to keep Dyllan Rives from seeing Hickory given her multiple requests. *See* ¶¶ 125 and 132.

236. Dyllan Rives delivered the Reginol™ to Anderson telling her the remaining eight vials were a donation in Hickory's name.

237. At some point, Elisa Rives told Anderson to check the record regarding whether or not Hickory was responding to medication because Hickory had been in the Neurology treatment room all day February 8, 2022. *See* ¶ 77, 100.

238. On February 17, 2022, Dyllan Rives met with Anderson and Wurlod.

239. Anderson said there was no way to assess whether the MMF was working because there was no way to assess Hickory's neuromuscular condition except for breathing trials, and Hickory was not breathing well. Anderson did not acknowledge Hickory's breathing deteriorated when McManemon took Hickory off ChEIs.

240. Anderson, stating Hickory was an atypical case of MG, suggested doing another electrodiagnostic test.

241. Wurlod said doing a tracheal tube would allow them to lower the amount of sedation Hickory was on so his strength could be assessed.

242. After meeting with Anderson and Wurlod, Dyllan Rives made the decision to do the tracheal tube because once again Anderson, Schumacher, Wereszczak, Wurlod and other defendants had given her yet another Hobson's choice.

243. The UTSAH/UTCVM business office called for another $5000 dollar for a total to date of $17500.

244. Anderson, saying she cared about Hickory, stated it had taken her all day to set up the continuous rate of infusion (CRI) to deliver the lowest dose of pyridostigmine 0.01mg/kg/hr.

245. Anderson, however, did not titer the pyridostigmine. If Anderson had correctly titered the dose Hickory could have come off the ventilator. *See* ¶¶ 398, 399.

246. Wurlod called for the evening update and said the tracheal tube placement went well, but telling Dyllan Rives once again she could not visit Hickory.

247. Over the next few days, Friday, Saturday, and Sunday, at Dyllan Rives' constant insistence Hickory's sedation levels were reduced.

248.    On Sunday afternoon, February 20, 2022, Julie Schildt (Schildt), another ECC critical specialist, allowed Dyllan, accompanied by Elisa Rives, to see Hickory.

249.    Hickory's edema seemed to have improved, the tracheal tube was in place, and Hickory appeared to be sleeping comfortably.

250.    On Monday February 21, 2022, Dyllan Rives was asked for another $7000 dollar for a total of $24500.[17]

251.    Later that day, around 1:00 p.m., Wurlod allowed Dyllan Rives exactly **a five-minute timed visit** with Hickory (Emphasis supplied).

252.    Wurlod informed Dyllan Rives, Hickory was asynchronous with the ventilator and uncomfortable with no explanation or reason why this was occurring.

253.    Dyllan Rives said "then get Schildt to come back in, apparently she knows how to set the ventilator".

254.    Wurlod said "she is not working this week".

255.    According to Hickory's SAICU records for February 21, 2022 at 11:00 a.m.: "p̄ is not breathing as well on vent after Dr. Wurlod Δ'd some of the settings on the vent."

256.    Dyllan Rives called the front desk and asked to speak with the director, hoping to come to some kind of financial arrangement so she (Dyllan Rives) could focus on Hickory.

---

[17]No one at UTSAH/UTCVM after February 13, 2022, provided a fee estimate or timeframe in regards to defendants' detainment of Hickory, and after February 13, 2022 there are no additional fee estimate contained in the record.

257.     The constant calls for large sums of money every few days were causing extreme duress, especially in light of all the misrepresentations/deception/lies made in regards to Hickory's condition. *See* footnote 17.

258.     Expecting Schumacher, Wereszcak came to speak with Dyllan Rives.

259.     Wereszczak said "she could assure us" there was nothing wrong in regards to Hickory's care.

260.     Elisa Rives attempted to explain there had been numerous misrepresentations/deception/lies and mistakes made in regards to Hickory's care, and Wereszcak's response was "How do you know? Are you a doctor?".

261.     Wereszcak said "if you are not happy with the way Hickory is being treated then why don't you just take him out of here. (Pausing briefly) Oh, wait I guess you can't because he is on a ventilator, he would die".

262.     Wereszczak also said something to the effect "you have to understand it from a business side, we have many owners who tell us money is not an issue, but we have to constantly ask for half the deposit because if the animal dies then we are left with the bill".[18]

263.     The constant calls for more and more money, the staging of Hickory for effect prior to every visit, the constant misrepresentations/deception/lies regarding Hickory's condition, and the constant coercion had taken its toll on Dyllan Rives, and she was questioning whether Schumacher, Wurlod, and Wereszczak and others were ever going to let Hickory come off the ventilator.

-----

[18] Wereszczak mumbled something to the effect 'we've never had one last this long'.

264. To relieve the financial stress Dyllan Rives sought financial support from her father James Rives.

265. The following day February 22, 2022, Hickory appeared the best he had been since being ventilated.

266. Most of the anesthesia had been removed, and Hickory was alert and responsive wagging his tail in recognition of his family.

267. This was the first-time Hickory was aware Dyllan Rives was there since February 10, 2022 (12 days).

268. On Wednesday February 23, 2022, Dyllan and Elisa Rives met with Wurlod, and Wurlod reported Hickory was the same as the day before.

269. Wurlod said Hickory was eating meat balls and drinking water from a syringe.

270. Dyllan and Elisa Rives then met with Wurlod and Talisha Moore (Moore), a professor in the UTCVM neurology department.

271. Wurlod said they were going to do a full blood culture to rule out antibiotic resistant infection because of concerns for their safety.

272. Wurlod suggested two more expensive diagnostics, a bone marrow aspirate and an echocardiogram, but Wurlod admitted other tests being done i.e., the full blood culture, would reveal similar information so both procedures were declined. *See* ¶ 271.

273. Moore was going to titer Hickory's pyridostigmine dose the next morning.

274. Wurlod kept insisting ECC could do the titering that night, but Dyllan Rives said "no" she wanted Moore (neurology department) to do it.

275.     On February 24, 2022, Dyllan became nervous when there was no call at the usual time.

276.     Finally, around 11:00 a.m. Wurlod called and said Hickory had suffered a pneumothorax, and if Hickory could not be stabilized, he would not make it through the day.[19]

277.     Dyllan and Elisa Rives went immediately to UTSAH.

278.     Upon arrival at UTSAH, Dyllan Rives called the front desk and told the front desk to tell Wurlod, Hickory's family was in parking slot 22 (a Covid19 protocol).

279.     Wereszczak met Dyllan and Elisa Rives on the sidewalk in the front saying she wanted us to see him (Hickory) taking us back to ECC and Hickory.

280.     Dyllan Rives asked Wereszczak why the police were there, and Wereszczak said "they" (UTSAH/UTCVM) treated the police canines.

281.     When Dyllan and Elisa Rives saw Hickory, he was again deeply sedated and back on high levels of propofol with a chest tube.

282.     Dyllan and Elisa Rives were directed to an exam room, and Wurlod, Wereszczak, and Schumacher entered.

283.     Wurlod began explaining Hickory's condition.

284.     Elisa Rives turned to Schumacher and explained she was an attorney, and she represented Dyllan Rives.

285.     Elisa Rives asked Schumacher to send the name of their counsel via email.

---

[19]There are numerous causes for pneumothorax, including but not limited to, improper ventilation settings.  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4021154/; *see also* https://www.karger.com/Article/Fulltext/342890

286.     Elisa Rives had never before mentioned anything in regards to legal action.

287.     Elisa Rives then questioned Wereszczak about the comment about getting the money before an animal dies. *See* ¶ 262.

288.     Wereszczak began to vehemently, angerly, and loudly deny she ever made the comment saying Elisa Rives was lying.

289.     When Dyllan Rives confirmed to Wereszczak saying "Yes Ma'am you said something to this effect", Wereszczak called Dyllan Rives a liar.

290.     Wereszczak then exited the room and two Police Officers, who were apparently called prior to Dyllan and Elisa Rives' arrival, entered the room and escorted Dyllan and Elisa Rives to the lobby.

291.     Both Dyllan and Elisa Rives spoke briefly with the two officers and asked what had been done to warrant them being called, and their response was nothing.

292.     The officers assured Elisa Rives they were present for all parties.

293.     Dyllan Rives paid an additional $5000 bringing the total to $30000 dollars.

294.     The next day Dyllan Rives called for the officers to escort her on her visit with Hickory, but the officers reported to the UTSAH front desk instead.

295.     The police incident report said Wereszczak had called about two possibly "disturbed individuals".

296.     The Police Report states: "Vet staff informed me that the clients are upset because of **the condition of the dog brought in by the individuals is so severe further care is not feasible.** Staff stated that this incident is costing the individuals more than

$3000 dollars a day, with a bill accruing over $52000 dollars. The reporting party also stated that these two individuals had been argumentative in the past and have "gotten into the face" of other staff members." (Emphasis supplied).

297.   On February 25, 2022, Elisa Rives emailed James Thompson, Dean of the College of Veterinary Medicine at the University of Tennessee detailing events surrounding Hickory's custody by UTSAH and asking for help to address the emergency situation.

298.   There was no reply from the Dean or his office.

299.   Also on February 25, 2022, counsel Michael Fitzgerald (Fitzgerald) returned Elisa Rives' call from the previous day.

300.   Elisa Rives explained she was reaching out to him (Fitzgerald) out of professional curtesy to make sure all parties were made aware of their legal duty as to the record.

301.   Fitzgerald said all parties would be informed of their duty to maintain the record.

302.   Over the weekend, February 26, 2022 and February 27, 2022, Schildt allowed Dyllan and Elisa Rives to visit Hickory for a few minutes each day, and Hickory appeared to be improving.

303.   On February 28, 2022, Kristen Marshall (Marshall) replaced Wurlod as the critical specialist in the ECC, and Moore from the neurology department began to titer the CRI pyridostigmine beginning at a rate of 0.0125 mg/kg/hr.

304.    Moore informed Dyllan Rives there was not enough injectable pyridostigmine.[20]

305.    Accordingly, Dyllan Rives was provided with another prescription, and she (Dyllan Rives) contacted Ingles' pharmacy for another ten vials of Regonol™.

306.    Dyllan Rives delivered the Regonol to Marshall the next day, and Dyllan Rives, as she had before, directed Marshall to consider any remaining vials of Regonol™ as a donation in Hickory's name.[21]

307.    On March 1, 2022, Moore increased the rate of pyridostigmine Hickory received to 0.0150 mg/kg/hr.

308.    On March 2, 2022, Moore increased the rate of IV pyridostigmine Hickory received to 0.0175 mg/kg/hr.

309.    Moore explained her calculation for converting the CRI dose to an oral dose to Dyllan Rives.

310.    Moore explained this CRI dose of pyridostigmine equates to the exact same dose Hickory was on when Hickory was discharged on January 13, 2022 (1/4 tablet (15mg) twice daily).

311.    This is also the same dose Hickory received on February 5, 2022 and February 6, 2022, when Hickory was walking with little to no assistance, immediately prior to McManemon increasing the pyridostigmine dose leading to the administration of atropine and then ultimately to ventilation. *See* ¶¶ 75, 82, 100.

---

[20] Anderson's original script was for two vials and Dyllan Rives delivered ten vials. *See* ¶¶ 220, 221, 236.
[21] Dyllan Rives donated the remaining injectable Reginol™ because Hickory would be on liquid oral pyridostigmine at home.

312.    On March 3, 2022, Marshall telephoned with the morning update, and said Hickory had been off the ventilator for over an hour.

313.    Marshall said she was sitting with Hickory and everything so far was looking good.

314.    Fitzgerald called while Dyllan and Elisa Rives were on their way to see Hickory wanting to know how UTSAH/UTCVM would be paid because Hickory would not be released without full payment.

315.    Elisa Rives informed Fitzgerald it was not an appropriate time because Dyllan Rives had not even had the opportunity to see Hickory since coming off the ventilator.

316.    As of March 3, 2022, Hickory had been on a ventilator for 21 days. To secure Hickory's safety Dyllan Rives paid another $5000 bringing the total to $35000.

317.    Dyllan and Elisa Rives delivered liquid pyridostigmine to Marshall so Hickory could be switched over and acclimated to the oral dose.

318.    Marshall wanted to remove the chest tubes stating in her opinion they were not necessary and commenting she did not see how Hickory developed pneumothorax when he (Hickory) was on such wimpy ventilator settings. *See* ¶ 276.

319.    On March 4, 2022, Hickory was still doing alright off the ventilator so after visiting with Hickory, Dyllan and Elisa Rives returned home to prepare for Hickory's home coming.

320.    Dyllan and Elisa Rives had been staying in a motel since February 9, 2022 because Dyllan Rives feared Schumacher, Wereszczak, Wurlod and possibly others at UTSAH/UTCVM would cause Hickory harm if she (Dyllan Rives) was not present.

321. On March 4, 2022, Dyllan Rives requested via email a full electronic record from Pam Brock.

322. Pam Brock replied she had tested positive for Covid19, and was quarantined until Tuesday March 8, 2022.

323. On March 5, 2022, around noon, Dyllan and Elisa Rives arrived at UTSAH to pick up Hickory.

324. Prior to Hickory being brought out, Dyllan and Elisa Rives met with ECC critical specialist Schildt for directions on nursing care.

325. Hickory was being sent home with ten bags of IV fluids with directions for Hickory to have two liters per day subcutaneously.

326. Hickory was also being sent home with numerous prescriptions including a prescription for gabapentin and several other drugs and directions for giving Hickory physical therapy.

327. McManemon, Lee, Anderson, Wurlod and other UTSAH personnel did not discuss drug interactions and ChEIs nor advised Dyllan Rives in regards to the management of Hickory's MG other than the nursing directions.

328. The discharge directions wanted Hickory seen by a veterinarian in five days for bloodwork.

329. Picking Hickory up from UTSAH was akin to a hostage exchange because UTSAH/UTCVM demanded full payment before Hickory would be released to Dyllan Rives.

330. Dyllan Rives wanted Hickory to be brought out before writing the check.

331.     Schildt and Dyllan Rives agreed Hickory would be brought to the lobby and after the check for $38878.91was written, Hickory could be wheeled out on a gurney and placed in Dyllan Rives' car.

332.     Hickory looked like a prisoner-of-war having lost significant weight, more than 15 pounds, and Hickory was in a very frail and fragile state with severe muscle wasting and weakness.

333.     Hickory was going to need 24-hour intensive care for weeks.

334.     The UTSAH/UTCVM invoice for February 4, 2022 to March 5, 2022 was for $73878.91. The invoice for January 11, 2022 to January 14, 2022 was for $1802.39 for a total of $75681.30.

335.     Hickory was in significantly worse condition than when Hickory was delivered into UTCVM/UTSAH's care to have his medication adjusted.

336.     The discharge papers listed a plethora of conditions caused by Hickory being on the ventilator as being resolved or presumed resolved.

337.     Schumacher handed Dyllan Rives a letter: "This letter is to inform you the University of Tennessee, Veterinary Medical Center effective March 5, 2022, will not see you as a client of the Small Animal Hospital anymore."

338.     On March 8, 2011, Dyllan Rives received via email an electronic record.

339.     In this record, there were back dated reports "CLINICIAN SUMMARY OF THE CASE" tacked on to the end of the electronic record (pages 753 to 772) electronically signed by McManemon, Lee, and Hogberg, and printed on March 8, 2022.

340.     On March 10, 2022, Dyllan and Elisa Rives took Hickory for bloodwork to Huntsville Veterinary Specialists & Emergency (HVSE) when Hickory's regular veterinarian PSAC refused to treat him.

341.     HVSE informed Dyllan Rives the blood work showed Hickory had Stage I Kidney Disease, probably as a result of his long-term ventilation.

342.     On Hickory's discharge papers one of the plethora of conditions Hickory suffered, as a result of being on the ventilator or in UTSAH/UTCVM's custody, was acute kidney injury.

343.     Dyllan Rives had never been told Hickory had acute kidney injury, and she learned of this upon reading the lists of conditions treated on the discharge papers.

344.     The discharge papers said the acute kidney injury was resolved.

345.     On March 21, 2022, Hickory passed.

346.     The cholinergic crisis Hickory suffered at home on February 3, 2022, leading to Hickory being readmitted to UTSAH was the direct result of McManemon directing Dyllan Rives to go up in the amount of pyridostigmine Hickory received from 1/4 tablet (15mg) every 12 hours, to 1/4 tablet (15mg) every eight hours, to 3/8 tablet (22.5 mg) every eight hours, to 1/2 tablet (30mg) every eight hours. *See* ¶¶ 37, 50, 52, 58.

347.     The cholinergic storm Hickory suffered on February 8, 2022 through February 10, 2022, leading to atropine being administered and ultimately to Hickory being ventilated was the direct result of McManemon and Lee giving Hickory too much ChEIs (pyridostigmine and/or neostigmine). *See* ¶¶ 82-83, 98-99, 100-101.

348.    After securing payment for the upper limit of $25000 on February 10, 2022 and February 13, 2022, McManemon then subsequently deprived Hickory of neostigmine on Sunday, February 13, 2022, inducing respiratory collapse. *See* ¶¶ 161, 166, 350-351.

349.    Rak, Lee, Hogberg and Wurlod without explanation simply said Hickory **was just not breathing well**. (Emphasis supplied). *See* ¶¶ 100, 166, 185.

350.    Hogberg in a telephone call with Dyllan Rives regarding the "no ventilation" told Dyllan Rives, McManemon ordered neostigmine be suspended.

351.    The SAICU record reflects "withhold neostigmine until neuro says give".

352.    McManemon was fully aware Hickory would suffer a respiratory collapse because of the "challenge" done from February 4, 2022 to February 5, 2022, and because McManemon had mention several times to Dyllan Rives she (McManemon) had Hickory on the lowest dose to prevent respiratory collapse. *See* ¶¶ 64, 66, 114-161, 169.

353.    McManemon, Lee, Anderson, Wurlod and other defendants either gave and/or withheld medication to create the response in Hickory they desired first requiring ventilation then extending Hickory's time on the ventilator.

354.    McManemon, Lee, Anderson, Schumacher, Wereszczak, Wurlod and others acting under color of state authority and law at all times acted solely in their self-interest with self-declared impunity under color of official right to forcefully take the personal property of Dyllan Rives and the Rives family causing them to suffer the loss of Hickory and to suffer substantial financial harm.

# STATEMENT OF CLAIMS

## COUNT ONE

### Deprivation of Constitutional Rights

### (42 U.S.C. § 1983)

355. Plaintiffs restate and reincorporate the above and forgoing facts and allegations of paragraphs one through three hundred and fifty-four, inclusive, of this complaint.

356. Any reasonable state actor knows the threatening of or killing of a person's beloved pet is unlawful.

357. "But for" McManemon and others directing Dyllan Rives to increase Hickory's pyridostigmine dose again and again while Hickory was at home, Hickory would not have needed to be readmitted under the false pretense of adjusting his pyridostigmine dosage.

358. "But for" McManemon and others overdosing Hickory with pyridostigmine, Hickory would not have needed atropine, and "but for" McManemon, Lee and others repeatedly administering neostigmine after administering atropine Hickory would not have experienced a cholinergic storm causing Hickory extreme respiratory distress necessitating ventilation and extended hospitalization.

359. "But for" McManemon and other defendants taking Hickory off the neostigmine causing further respiratory distress and failing to titer the ChEIs, Hickory's time on the ventilator would not have been extended.

360. Defendants, McManemon, Lee, Anderson, Schumacher, Wereszczak, Wurlod and others, acting under color of state authority in regards to Hickory caused him

to suffer many iatrogenic conditions: aspiration pneumonia, respiratory distress, cholinergic crisis, hypoalbuminemia, neutrophilia, non-regenerative hypochromic anemia, Grade III/IV systolic heart murmur, moderate tracheostomy secretions, bilateral pneumothorax, ventral cervical swelling, acute kidney injury, superficial corneal ulcer, and bilateral pleural effusion, and other life-threatening conditions.

361.    Defendants, McManemon, Lee, Anderson, Schumacher, Wereszczak, Wurlod and others, as a result of their actions under color of state authority, deprived Dyllan Rives of her "property" Hickory, while he was hospitalized at UTSAH from February 4, 2022 to March 5, 2022, because defendants exercised complete dominion and control over Hickory.

362.    Defendants, McManemon, Lee, Anderson, Schumacher, Wereszczak, Wurlod and others, acting under color of state authority and law, permanently deprived Dyllan Rives of Hickory because "but for" defendants' actions Hickory would not have suffered life-threatening conditions causing Dyllan Rives to be permanently deprived of her beloved Hickory.

363.    Dyllan Rives was permanently deprived of her "property" Hickory on March 21, 2022.

364.    Defendants, McManemon, Lee, Anderson, Schumacher, Wereszczak and Wurlod and other unnamed individuals, had a duty of care, a fiduciary duty, to act in the best interest of Hickory not in their interest: financial, career, business, reputation, pecuniary, personal gain etc.

365.    Once the Dean and UTCVM's legal representative were notified, defendants Schumacher and Wereszczak and others, acting under color of state authority,

informed Dyllan Rives, Hickory was no longer UTCVM's concern and hastily sought to get Hickory out of their custody without consideration of the consequences to Hickory.

366.    Defendants as state actors denied services to Dyllan Rives causing additional harm to her personal property Hickory. *See* ¶ 337.

## COUNT TWO

## Taking of Personal Property And Assets

## (42 U.S.C. § 1983)

367.    Plaintiffs restate and reincorporate the above and forgoing facts and allegations of paragraphs one through three hundred and sixty-six inclusive, of this complaint.

368.    Defendants in their individual capacity acting under color of state authority took custody of Hickory under false pretenses and once in defendants' custody exploited Hickory as a vehicle of extortion.

369.    Defendants, the University of Tennessee , UTSAH and UTCVM, by and through McManemon, Lee, Anderson, Schumacher, Wereszczak, and Wurlod and others, as employees, agents and representatives of UTSAH/UTCVM acting under color of state authority deprived Dyllan Rives collectively "the Rives" of exorbitant assets under duress while threatening Dyllan Rives' personal property, Hickory, entitling plaintiffs to restitution.

370.    Dyllan Rives and James Rives paid an unconscionable sum of money towards Hickory's preservation while at UTSAH/UTCVM and an even more unconscionable sum to secure Hickory's release from UTSAH.

371.    The result of defendants' actions, under the color of official right, was the destruction of Dyllan Rives' property, her beloved Hickory, and the payment of exorbitant and unconscionable sums.

## COUNT THREE

## The Hobb's Act And Extortion

## (18 U.S.C § 1951)

372.    Plaintiffs restate and reincorporate the above and forgoing facts and allegations of paragraphs one through three hundred and seventy-one, inclusive, of this complaint.

373.    Defendants, the University of Tennessee, UTSAH and UTCVM, by and through McManemon, Lee, Anderson, Schumacher, Wereszczak, and Wurlod and others, as employees agents, and representatives of UTSAH/UTCVM acting under color of official right, used their public office to unfairly influence Dyllan Rives to part with her personal property, Hickory, thereby affecting interstate commerce.

374.    While the law recognizes pets only as "personal property" there is no denying the emotional ties between a person and/or family and their beloved pet.

375.    The veterinary industry as a whole uses this well-known relationship between pets and their family to promote their legitimate business interests, and the State of Tennessee has recognized the importance of the bond between pets and their families for well over a century.

376. Defendants, McManemon, Lee, Anderson, Schumacher, Wereszczak, Wurlod, acting under color of official right exploited the bond between Dyllan Rives and Hickory and exploited Hickory as an integral part of a scheme to extort money.

377. "But for" defendants' wrongful actions Hickory could have received proper veterinary care at North Carolina State University.

## COUNT FOUR

### Extortion

### (Tenn. Code § 39-14-112)

378. Plaintiffs restate and reincorporate the above and forgoing facts and allegations of paragraphs one through three hundred and seventy-seven, inclusive, of this complaint.

379. Under Tenn. Code § 39-14-112: "(a) A person commits extortion who uses coercion upon another person with the intent to: (1) Obtain property, services, any advantage or immunity; (2) Restrict unlawfully another's freedom of action; or (3) (A) Impair any entity, from the free exercise or enjoyment of any right or privilege secured by the Constitution of Tennessee, the United States Constitution or the laws of the state, in an effort to obtain something of value for any entity; . . ."

380. Causing Hickory to be placed in UTSAH's custody and causing Hickory to need ventilation through the manipulation of drugs, constantly staging Hickory for effect, constantly making requests for expensive miscellaneous diagnostic procedures in an attempt to drive up the costs, demanding money over and over and over again, drawing out the time Hickory was on the ventilator, and calling the police to apply pressure, intimidate, and harass were integral parts of a scheme employed by

McManemon, Lee, Anderson, Schumacher, Wereszczak, Wurlod and others acting under color of state authority to extort Dyllan Rives under a threat of harm to Hickory.

381. Repeated and frequent demands for payments for the preservation of Hickory while extending the time Hickory was on the ventilator are related predicate acts wherein defendants acting under color of official right extorted exorbitant and unconscionable amounts of money.

382. Ultimately, Dyllan Rives and collectively the Rives' have been deprived of a beloved family member and their money under threat of harm to Hickory, Dyllan Rives' personal property, suffering extreme emotional distress as victims of an extortion scheme under color of official right.

## COUNT FIVE

### Civil Conspiracy

### 42 U.S.C. § 1985

383. Plaintiffs restate and reincorporate the above and forgoing facts and allegations of paragraphs one through three hundred and eighty-two, inclusive, of this complaint.

384. Defendants, Schumacher, Wurlod, Wereszczak and others are well aware of the legal duty to treat personal property placed in the care of the bailee (UTSAH/UTCVM) in a way that does not cause harm.

385. Defendants, Schumacher, Wurlod, Wereszczak and others, are also well aware of the legal duty to mitigate damages in the event harm occurs to the personal property while in the bailee's (UTSAH/UTCVM) custody regardless of the intent of the employee/agent/representative causing harm.

386.    Defendants, Schumacher and Wereszczak and others, employees, representatives, and agents of the bailee (UTSAH/UTCVM), and defendant Wurlod, another person from another institution, engaged in a civil conspiracy for the purpose of coercing Dyllan Rives' to kill Hickory in an attempt to relieve the bailee (UTSAH/UTCVM) and other named and unnamed defendants of liability.

387.    Specifically, instead of documenting and acknowledging culpability for the events of February 8, 9, and 10, 2022, defendants, Schumacher, Wurlod, Wereszczak and others, acting under color of official right chose instead to force a Faustian bargain onto Dyllan Rives- either kill Hickory, something she (Dyllan Rives) morally could not do, or continue to pay exorbitant sums of money while defendants through their actions and inactions extended Hickory's time on the ventilator ultimately and as a consequence causing Hickory's demise. *See* ¶¶ 145, 245, 273 through 276 *supra* and footnote 19.

388.    After February 13, 022, Dyllan Rives was never provided estimates nor timelines in regards to Hickory's forced detainment. *See* footnote 6 and 17.

389.    Defendants, Schumacher, Wurlod, Wereszczak and others, acting under color of official right and working in concert, instead of acknowledging and mitigating the damage done to Hickory by the bad acts of McManemon, Lee and others leading to Hickory needing ventilation, engaged in a pattern of extortion insisting on miscellaneous and unnecessary diagnostic tests, consultations, procedures, and treatments in an attempt to force a desired outcome, Hickory's demise, which would afford defendants immunity.

390.    Defendants, Schumacher, Wurlod, Wereszczak and others, engaged in a conspiracy to coverup their culpability by simultaneously demanding ever increasing

amounts of money while at the same time manipulatively extending the time Hickory was on the ventilator.

## COUNT SIX

### Threat, Intimidation, Malicious Harassment

### (42 U.S.C. § 1983)

391.    Plaintiffs restate and reincorporate the above and forgoing facts and allegations of paragraphs one through three hundred and ninety, inclusive, of this complaint.

392.    Schumacher and Wereszczak under color of state authority in a show of force and intimidation threatened Dyllan Rives in a further attempt to get her to kill Hickory by calling the police and complaining Dyllan Rives was a "disturbed individual[s]" because "they" (UTSAH/UTCVM) had been presented with an untreatable dog and "they" (UTSAH/UTCVM) were being forced to take $3000 dollars a day.

393.    The police report states: "the client[s] are [is] upset because of the condition of the dog brought in by the individual[s] is so severe further care is not feasible."

394.    On Monday February 28, 2022, after Elisa Rives emailed the Dean of UTCVM, Moore, Marshall, and other UTSAH personnel initiated the titering of Hickory's pyridostigmine dosage.[22] *See* ¶¶ 245, 273 and 274 *supra* and footnote 19.

395.    Two days later on March 3, 2022, Hickory was off the ventilator.

---

[22]Hickory was admitted on February 4, 2022, to have his pyridostigmine dosage adjusted i.e., "titered".

## COUNT SEVEN

### Breach of Fiduciary Duty and Duty of Care

### (Breach of Bailment)

396.     Plaintiffs restate and reincorporate the above and forgoing facts and allegations of paragraphs one through three hundred and ninety-five, inclusive, of this complaint.

397.      UTSAH/UTCVM as bailee(s) assumed a legal and fiduciary responsibility to safeguard the bailor's property Hickory while in their custody.

398.     McManemon, Lee, Anderson, Schumacher, Wereszczak, Wurlod and other unnamed defendants (UTSAH/UTCVM) owed an ethical duty to care for Hickory in Dyllan Rives' interest.

399.     McManemon, Lee, Anderson, Schumacher, Wereszczak, Wurlod and other unnamed defendants breached their ethical and fiduciary duty by: acting in their interest rather than Hickory's interest; by failing to treat Hickory with competence and with compassion and respect for Hickory's welfare and Dyllan Rives' welfare; by failing to be honest in their relaying of information pertinent to Hickory's care and/or misrepresenting/deceiving/lying about Hickory's medical state; by attempting to manipulate and coerce an outcome in defendants' interest rather than Hickory's and Dyllan Rives' interest; by failing to follow the law in regards to Hickory's bailment; by interfering with Dyllan Rives' attempts to transfer Hickory to another facility in North Carolina; by defaming and libeling Dyllan Rives as [a] "disturbed individual[s]"; by threatening Dyllan Rives by calling the police; by allowing outside influences rather than their care of Hickory being their sole influence; and, by being interested in improper

financial considerations i.e. extortion under color of official right etc.; by breaching the veterinary-client-patient relationship and by terminating the relationship without notification to Dyllan Rives; by misrepresenting, deceiving, and lying about Hickory's state to influence how other veterinarians considered Hickory's condition; by attempting to coerce Dyllan Rives to kill Hickory; by extending Hickory's time on the ventilator causing life-ending complications; by failing to address reports and/or complaints; by failing to supervise other veterinarians over whom certain defendants had supervisory authority, by doing damage to Dyllan Rives (a client) and to the veterinary profession as a whole etc.

400.    McManemon, Lee, Anderson, Schumacher, Wereszczak, Wurlod and other unnamed defendants as fiduciary(ies) failed to discharge their duties with respect to Hickory: by instructing the overdosing of Hickory with pyridostigmine at home causing Hickory to be readmitted to UTSAH; by overdosing Hickory with pyridostigmine at UTSAH causing Hickory to go into cholinergic crises requiring atropine; by continuing to overdose Hickory with neostigmine in combination with atropine causing Hickory to go into a cholinergic storm causing a life-threatening state leading to ventilation as a life saving measure; by overdosing Hickory with ChEIs ensuring defendants continued custody of Hickory as a means to extort exorbitant sums; by foreclosing Hickory's chance at possible life saving treatment at North Carolina State; by discontinuing treatment with ChEIs causing respiratory collapse; by constantly misleading, misrepresenting and deceiving Dyllan Rives in regards to Hickory's condition to coerce Dyllan Rives to kill Hickory or alternatively exhausting and/or deplete all Dyllan Rives' revenue in an attempt to force Dyllan Rives to kill Hickory thereby relieving defendants

of liability; by not titering Hickory's pyridostigmine dosage keeping him (Hickory) on the ventilator for 21 days; by assuring Dyllan Rives "they" were taking care of Hickory when defendants were in fact needlessly causing Hickory harm; by failing to ventilate Hickory properly causing bilateral pneumothorax further extending Hickory's time on the ventilator; by causing life-ending complications as a result of being on the ventilator for an extended time; by continuously and needlessly sedating Hickory to keep him in a poor state; by depleting Dyllan Rives of all resources through their extortion scheme circumventing future treatment options for Hickory; by failing to give Hickory proper care causing complications such as Stage I Kidney Disease; by failing to advise Dyllan Rives in regards to drug interactions, the use of ChEIs and MG; and by failing to advise Dyllan Rives regarding Hickory's condition leading to certain death etc.

## COUNT EIGHT

### Intentional Infliction of Emotional Distress

401.     Plaintiffs restate and reincorporate the above and forgoing facts and allegations of paragraphs one through four hundred inclusive, of this complaint.

402.     McManemon, Lee, Anderson, Schumacher, Wereszczak, Wurlod and others, regardless of plaintiffs' attempts to resolve issues, continued to inflict emotional distress by constantly misrepresenting facts and/or failing to disclose facts regarding Hickory's condition, by failing to titer Hickory's ChEIs dosage instead opting to extend Hickory's time on the ventilator, by constantly demanding money while continually extending the time Hickory was on the ventilator without time or fee estimates, by staging Hickory by sedating him and limiting visitation by Dyllan Rives, by repeatedly coercing Dyllan Rives to kill Hickory when defendants knew Hickory could come off the

ventilator, by defendants causing Hickory to be in a life-threatening condition, and by
calling the police under false pretenses as further means of intimidation and harassment
to force Dyllan Rives to kill Hickory.

403.     Defendants constantly threatened Hickory's health by improperly altering
medications causing Hickory harm ultimately leading to Hickory's death causing
emotional harm to Dyllan Rives and the Rives' family in the furtherance of defendants'
extortion scheme under color of official right in defendants' self-interest.

### REQUESTED RELIEF

Based on the foregoing actions of the defendants, plaintiffs suffered injury
entitling them to relief.

**WHEREFORE** plaintiffs demand judgment as follows:

(i).     A jury trial.

(ii).     Judicial determination that defendants violated the plaintiff Dyllan Rives'
constitutional rights by acting "under color of law" to deprive Dyllan Rives of her
personal property, Hickory, and by using threats to Hickory as a means of extorting over
$75000 dollars from the Rives without due process of law, and by denying Dyllan Rives
equal protection of the law;

(iii).     Judicial determination that the defendants breached their fiduciary duty
and duty of care to Dyllan Rives' personal property "Hickory" and entitling plaintiffs to
restitution of plaintiffs' payments made to UTSAH and other defendants;

(iv).     Judicial determination that the defendants through an organized scheme
coordinated to extort more than $75000 dollars, thereby circumventing plaintiff from

taking Hickory to North Carolina State University, and thus interfering with interstate commerce and Dyllan Rives' constitutional rights;

(v.)    Judicial determination that the defendants' wrongful conduct entitle plaintiffs to other equitable and remedial relief as the court may deem appropriate, including "but not limited" to prospective injunctive relief removing culpable defendants as state actors from positions of trust prospectively; and, injunctive relief requiring UTSAH to initiate and install internal procedures which shield client patient care from improper influence by business decision-makers;

(vi).    Statutory sanctions as a result of defendants' violation of Tenn. Code § 39-14-105 (a)(1)(A) by knowingly and unlawfully causing injury through mistreatment of Hickory that resulted in Hickory's death;

(vii).    Award of costs and a reasonable attorney's fee;

(viii).    Award of compensatory and punitive damages to deter defendants from acting unlawfully towards clients in the future; and,

(ix).    Award plaintiffs any other relief that the court deems appropriate to redress the defendants' wrongful actions and/or violations of federal and state law.

Respectfully submitted,

Elisa S. Rives LLC
ASB # 9351-E61R
Attorney for plaintiffs
Dyllan M. Rives
James R. Rives

OF COUNSEL:
Elisa S. Rives, LLC, 1226 Holiday Shores Rd., Scottsboro, AL 35976, Tel:  (256) 558-4626