UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| DYLLAN RIVES and JAMES R. RIVES, | ) | |
| | ) | |
| Plaintiffs, | ) | 3:22-CV-00414-DCLC-JEM |
| | ) | |
| v. | ) | |
| | ) | |
| UNIVERSITY OF TENNESSEE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Hickory was Plaintiff's dog. When Hickory became ill, Plaintiffs did everything they could to get him the best veterinary care available. In the process, they spent over $70,000. They trusted the care of Hickory to the Defendants. But when Hickory died two weeks after Defendants discharged him from their care, Plaintiffs sued, alleging various theories of liability, including a deprivation of constitutional rights and property interests, extortion, civil conspiracy and claims of malicious harassment. Defendants have filed a Motion to Dismiss [Doc. 25]. For the reasons that follow, the Court finds Plaintiffs are not entitled to proceed and the First Amended Complaint is **DISMISSED WITH PREJUDICE**.

I. **BACKGROUND**

Hickory was injured in early January 2022 [Doc. 23, ¶ 17]. When his condition deteriorated, Defendant Caitlin McManemon ("McManemon") saw Hickory at UTSAH on January 11, 2022 and diagnosed him with Myasthenia Gravis (MG), an immune-mediated neuromuscular condition [Doc. 23, ¶¶ 19–25]. UTSAH discharged Hickory on January 13, 2022 with a prescription for a drug known as a Cholinesterase Inhibitor (ChEI) [Doc. 23, ¶¶ 30–31].

1

Too little ChEIs in patients with MG can lead to respiratory failure; too much, and adverse reactions result [Doc. 23, ¶ 172]. Treating patients with this medication requires finding the right balance [Doc. 23, ¶ 172]. Hickory did well on this medication for a time, but then on January 27 or 28, 2022, he developed symptoms [Doc. 23, ¶¶ 39, 44]. Per McManemon's instructions, Plaintiff Dyllan Rives raised Hickory's dose [Doc. 23, ¶¶ 47, 50]. Hickory got even worse on the higher dose, and even after UTCVM told Dyllan Rives to lower it again, he experienced overdose symptoms [Doc. 23, ¶¶ 52–55, 58–59]. The following morning, Dyllan Rives followed UTSAH's recommendation to bring Hickory into the hospital to adjust his medication [Doc. 23, ¶¶ 60–61, 63]. The hospital asked for a deposit of a portion of the eventual bill [Doc. 23, ¶ 61].

At some point, Plaintiffs claim, McManemon began "misrepresenting facts" [Doc. 23, ¶ 173]. Nonetheless, from February 5 to February 10, 2022 McManemon reported her efforts to adjust Hickory's medication [Doc. 23, ¶¶ 65, 92]. She "challenge[d]" him to go without it, confirming he still needed it, then reintroduced it [Doc. 23, ¶¶ 64–67]. Hickory "respond[ed] favorably" [Doc. 23, ¶¶ 67–68]. McManemon then tried dosing him more often, but he began showing overdose-like symptoms [Doc. 23, ¶¶ 74–78]. However, McManemon stated she did not think he was experiencing an overdose, and that "we just need to play with his dose" [Doc. 23, ¶ 79]. The following day, Hickory received a significantly higher dose before McManemon could examine him, necessitating an antidote and oxygen [Doc. 23, ¶ 82, 84–85]. On February 9, 2022, Dyllan Rives told McManemon she intended to take him to North Carolina State University to receive an alternative treatment [Doc. 23, ¶¶ 87–88]. McManemon expressed concern about transporting Hickory in his condition [Doc. 23, ¶ 90].

Before Dyllan Rives could move Hickory, things took a turn for the worse. That night, McManemon called Dyllan Rives explaining Hickory's oxygen levels were dropping and he could

die without a ventilator [Doc. 23, ¶¶ 92, 95–96]. Dyllan Rives consented to the ventilator [Doc. 23, ¶ 97]. McManemon informed her she should come see Hickory because few animals "with pneumonia" needing ventilation survive [Doc. 23, ¶ 102]. UTCVM called asking for a $6,500 deposit shortly after the visit [Doc. 23, ¶ 108].

Hickory remained on the ventilator and continued receiving ChEIs at what McManemon stated was the "lowest possible dose to prevent respiratory collapse or paralysis" [Doc. 23, ¶ 114]. McManemon updated Plaintiffs again stating Hickory had experienced overdose-like symptoms, but she could not confirm his medication was to blame [Doc. 23, ¶¶ 146–149].[1] She requested an additional deposit [Doc. 23, ¶ 151]. Plaintiffs' counsel Elisa Rives was on the call and noted "while we support Hickory, a blank check [is] not being written for any additional mistakes" [Doc. 23, ¶ 152]. McManemon stated Hickory needed the ventilator because he was "exhausted," not because his dose was too high [Doc. 23, ¶ 153]. Elisa Rives countered that the antidote Hickory received "is given to counteract the effects of too much . . . [medication] not too little" [Doc. 23, ¶ 154]. Plaintiffs stopped hearing from McManemon after that, but the UTSAH/UTCVM business office did call to request an additional deposit [Doc. 23, ¶¶ 155, 157].

On February 14, 2022, a resident called to update Plaintiffs [Doc. 23 ¶¶ 162–63]. She explained Hickory had temporarily stopped receiving his medication because he was "not responding" to it, but she stated she wanted to try restarting a lower dose [Doc. 23, ¶ 166, 176]. Because this resident thought Hickory needed a lower dose, Plaintiffs assert McManemon was lying when she said Hickory was on the lowest possible dose [Doc. 23, ¶¶ 168–73].

Plaintiffs arranged a meeting with emergency care employees [Doc. 23, ¶¶ 177–78].

---

[1] According to the Amended Complaint, signs of an overdose include salivation, lacrimation, urination, and diarrhea [Doc. 23, ¶ 111 n. 11].

3

During that meeting, "Dyllan Rives stated Hickory was on the ventilator because of [an overdose] and not because of pneumonia," and employees familiar with Hickory's care "nodded in agreement" [Doc. 23, ¶ 180]. Plaintiffs therefore claim McManemon "misrepresented" why Hickory was on the ventilator when she stated it was because of pneumonia [Doc. 23, ¶¶ 181–83]. They also claim Hickory's veterinarians stated his "breathing tests had always been with pressure support," whereas clinical notes stated he "breathed on his o[w]n during trial without ventilation" [Doc. 23, ¶¶ 185–86]. Though Elisa Rives stated at the meeting "the goal was to get Hickory off the ventilator as soon as possible," Plaintiffs claim Defendants failed to properly calibrate Hickory's medication dose, prolonging his time on the ventilator [Doc. 23, ¶¶ 195, 245]. At a subsequent meeting, [*see* Doc. 23, ¶¶ 201–02], Defendant Juergen Schumacher ("Schumacher"), head of UTSAH, asked "what's the time line here?" and noted "you can keep him (Hickory) alive on the ventilator indefinitely, but that is not life . . ." [Doc. 23, ¶ 210–11]. Dyllan Rives replied "there is no time line" [Doc. 23, ¶ 214].

After Defendants requested two additional deposits, [*see* Doc. 23, ¶¶ 243, 250], Dyllan Rives sought a "financial arrangement" [Doc. 23, ¶ 256]. But Defendant Leslie Wereszczak ("Wereszczak") purportedly told Plaintiffs "you have to understand it from a business side, we have many owners who tell us money is not an issue, but we have to constantly ask for half the deposit because if the animal dies then we are left with the bill" [Doc. 23, ¶ 262].

Dyllan and Elisa Rives visited UTSAH again and this time noticed the police were present [Doc. 23, ¶¶ 278–80]. After informing Wereszczak she was an attorney representing Dyllan Rives, Elisa Rives asked Wereszczak about the comment she made about deposits, and she "vehemently, ang[ri]ly, and loudly" denied having made it [Doc. 23, ¶¶ 287–88]. Police escorted Dyllan and Elisa Rives out of the room [Doc. 23, ¶ 290]. Dyllan Rives paid another deposit [Doc. 23, ¶ 293].

4

The next day, Dyllan Rives called the police herself, but instead of responding to her, they responded to the UTSAH front desk to a call concerning "two possibly 'disturbed individuals'" [Doc. 23, ¶¶ 294–95].

Starting March 1, 2022, Hickory returned to an earlier dose of his medication, and he came off the ventilator on March 3, 2022 [Doc. 23, ¶¶ 307–12]. Dyllan Rives paid an additional deposit, bringing the total deposit to $35,000 [Doc. 23, ¶ 316]. Dyllan and Elisa Rives picked Hickory up from the hospital on March 5, 2022 [Doc. 23, ¶ 323]. UTSAH required Plaintiffs to pay the remaining $38,878.91 balance in full before discharging Hickory [Doc. 23, ¶¶ 314, 331]. At discharge, Schumacher gave Dyllan Rives a letter stating "the University of Tennessee, Veterinary Medical Center . . . will not see you as a client of the Small Animal Hospital anymore" [Doc. 23, ¶ 337]. Hickory had developed a kidney injury, likely from his time on the ventilator [Doc. 23, ¶¶ 341–42]. He passed on March 21, 2022 [Doc. 23, ¶ 345]. This lawsuit followed.

## II.  LEGAL STANDARD

A Rule 12(b)(1) motion is construed as either a facial attack or a factual attack on subject matter jurisdiction. *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). A motion that "merely questions the sufficiency of the pleading" is a *facial* attack and a motion is considered a *factual* attack if it requires the Court to "weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist." *Id*. Defendants' motion is a facial attack because it claims the Eleventh Amendment deprives this Court of jurisdiction to entertain a lawsuit against an arm of the State of Tennessee [Doc. 26, pg. 16].

A motion to dismiss under Rule 12(b)(6) requires the Court to construe the complaint in the light most favorable to the plaintiff and accept its factual allegations as true. *Meador v. Cabinet for Human Res.*, 902 F.2d 474, 475 (6th Cir. 1990). To survive dismissal, the plaintiff must allege

5

facts that are sufficient "to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).  The court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), and dismissal is appropriate "if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

## III.    ANALYSIS

### A.    University of Tennessee, University of Tennessee College of Veterinary Medicine, John and Ann Tickle Small Animal Hospital

Plaintiffs have sued the University of Tennessee and its College of Veterinary Medicine and the John and Ann Tickle Small Animal Hospital.  They acknowledge that each of these Defendants are "quasi-governmental corporation[s]." [Doc. 23, ¶¶ 5, 7, 9].  And, although the College of Veterinary Medicine and the Small Animal Hospital are named separately, they are part of the University of Tennessee [Doc. 26, pg. 10 fn. 2].  Suits against the University of Tennessee and its subsidiaries are against the state for Eleventh Amendment purposes.  *See Carlson v. Highter*, 612 F. Supp. 603, 604–05 (E.D. Tenn. 1985) ("The University of Tennessee is an agency of the state . . . ."); *Hiefner v. University of Tennessee*, 914 F. Supp. 1513, 1515 (E.D. Tenn.1995) (noting that as an arm or alter-ego of the State of Tennessee, the University of Tennessee was entitled to the State's Eleventh Amendment immunity from suit); *see also Dunn v. W.F. Jameson & Sons, Inc*., 569 S.W.2d 799 (Tenn. 1978); *Applewhite v. Memphis State Univ*., 495 S.W.2d 190 (Tenn. 1973); *Greenhill v. Carpenter*, 718 S.W.2d 268 (Tenn. Ct. App. 1986).  These Defendants contend that Plaintiffs' action against them is barred by the Eleventh Amendment to the United States Constitution.  The Eleventh Amendment provides:

Case 3:22-cv-00414-DCLC-JEM   Document 68   Filed 03/18/24   Page 6 of 23   PageID #: 841

The judicial power of the United States shall not be construed to extend to any suit in law or equity . . . against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. "This amendment … prevents federal courts from having jurisdiction in lawsuits brought by private plaintiffs where the state is a defendant." *Morgan v. Bd. of Prof'l Responsibility of the Sup. Ct. of Tenn.*, 63 F.4th 510, 515 (6th Cir. 2023) (citing *Whole Woman's Health v. Jackson*, ––– U.S. –––, 142 S. Ct. 522, 532, (2021)). It has been well established that citizens of another state cannot sue a state in federal court in the absence of an unequivocal waiver of sovereign immunity. *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89 (1984). As all of Plaintiffs' claims against the University of Tennessee, its College of Veterinary Medicine, and its Small Animal Hospital are claims against the State of Tennessee, Rives' claims are barred by the doctrine of Sovereign immunity. *Boinapally v. Univ. of Tenn.*, 23 F. App'x 512, 515 (6th Cir. 2001) ("The University of Tennessee, as an arm of the State of Tennessee, is immune to suit in federal court under the doctrine of sovereign immunity."); *Drew v. Univ. of Tenn. Reg'l Med. Ctr. Hosp.*, No. 99-5070, 2000 WL 572064, at *3 (6th Cir. May 1, 2000); *Sherrod v. Univ. of Tenn.*, No. 12-2808-STA-cgc, 2013 WL 5306065, at *3 (W.D. Tenn. Sept. 20, 2013); *Galloway v. Univ. of Tenn.*, No. 3:06-CV-00461, 2007 WL 2263103, at *2 (E.D. Tenn. Aug. 2, 2007) ("the University of Tennessee maintains absolute immunity in that the University of Tennessee is clearly an 'arm of the state' and no exceptions apply").

Plaintiffs argue that the University of Tennessee is not entitled to Eleventh Amendment immunity based on the holding in *Soni v. Board of Trustees of University of Tennessee,* 513 F.2d 347, 351 (6th Cir. 1975) [Doc. 27, pgs. 17–18]. In *Soni*, the Sixth Circuit found that "Tennessee has waived the immunity by consenting to suits against the University of Tennessee." 513 F.2d at 352. After the *Soni* decision, the Tennessee legislature enacted Tenn. Code Ann. § 20-13-102(b) clarifying that "[n]o statutory or other provision authorizing the University of Tennessee and its

board of trustees to sue and be sued shall constitute a waiver of sovereign immunity." Tenn. Code Ann. § 20–13–102(b). "[T]he effect of *Soni* was abrogated by the Tennessee General Assembly . . ." in enacting § 20-13-102(b). *Woolsey v. Hunt*, 932 F.2d 555, 565 (6th Cir. 1991). Thus, Plaintiffs' reliance on *Soni* is misplaced. As the State of Tennessee has not waived its immunity to § 1983 claims, these Defendants enjoy immunity and Rives' claims against them are **DISMISSED**.

Plaintiffs contend an exception to Eleventh Amendment immunity applies to their claims for prospective injunctive relief [Doc. 27, pg. 18; *see* Doc. 23, Prayer for Relief, ¶ vi]. "The exception set forth in *Ex Parte Young* allows plaintiffs to bring claims for prospective relief against state officials sued in their official capacity to prevent future federal constitutional or statutory violations . . . ." *Boler v. Earley*, 865 F.3d 391, 412 (6th Cir. 2017); *see Ex Parte Young*, 209 U.S. 123, 159–160 (1908). But to qualify for the exception, the plaintiff must seek to enjoin a "continuing violation of federal law." *Morgan*, 63 F.4th at 515 (quoting *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013)). "If the complaint fails to make clear what those ongoing violations are, the exception does not apply." *Id.* (quoting *Boler*, 865 F.3d at 412) (internal quotation marks omitted). Here, Plaintiffs allege no ongoing violation of federal law. Any purported violations ceased when Defendants released Hickory back to Plaintiffs' care [Doc. 23, ¶¶ 323–37]. Plaintiffs do not qualify for prospective injunctive relief under *Ex Parte Young*.

**B.      Official Capacity Claims against Chancellor Donde Plowman ("Plowman"), Dean James Thompson ("Thompson"), Department Head Juergen Schumacher, and Director Leslie Wereszczak**

Plaintiffs have also asserted claims against Plowman, Thompson, Schumacher and Wereszczak in their official capacity. Claims against state officials in their official capacity are "no different from a suit against the State itself." *Will v. Michigan Dep't of State Police*, 491 U.S.

8

58, 71 (1989). And state law also provides that immunity extends to "any officer of the state acting by authority of the state." Tenn. Code Ann. § 20-13-102(a). By suing state employees in their official capacities, Plaintiffs are essentially suing the state itself. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (holding "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity"); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978) ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.").

Additionally, the Eleventh Amendment prohibits suits against a state or its agencies in federal court for damages, unless Congress has abrogated its immunity, or the state has expressly waived it. *See Pennhurst State Sch. & Hosp. v. Halde*rman, 465 U.S. 89, 99-101 (1984); *Quern v. Jordan*, 440 U.S. 332, 345 (1979). Congress did not abrogate sovereign immunity when it enacted § 1983. *Will*, 491 U.S. at 66. And the State of Tennessee has not waived its immunity to suit under § 1983. *Berndt v. State of Tennessee*, 796 F.2d 879, 881 (6th Cir. 1986) (noting that Tennessee has not waived immunity to suits under § 1983). Accordingly, Plaintiff cannot maintain suit against Defendants in their official capacities, and all such claims will be **DISMISSED**.

**C.** **Individual Capacity Claims against Chancellor Donde Plowman, Dean James Thompson, Department Head Juergen Schumacher, Director Leslie Wereszczak, Kimberly Anderson, Virginie Wurlod-Talbot, Caitlin McManemon, Brett Hogberg, and Jack Lee**

To state a claim against these Defendants individually, Plaintiffs must adequately plead that each Defendant, by his or her own actions, has violated the Constitution. *Iqbal*, 556 U.S. at 676; *see also Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (providing that "a complaint must allege that the defendants were personally involved in the alleged deprivation of federal rights" to state a claim upon which relief may be granted). This requirement exists because constitutional liability cannot attach to a defendant solely based on his or her position of authority.

9

*See Iqbal*, 556 U.S. at 676 ("[O]ur precedents establish . . . that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."); *Monell*, 436 U.S. at 691 (finding that liability under § 1983 may not be imposed merely because a defendant "employs a tortfeasor"). The Court will examine the allegations against each individual Defendant.

      a.    *Defendant Chancellor Donde Plowman*

In the Amended Complaint, Plaintiffs have not identified any personal involvement by Defendant Plowman that would give rise to any individual § 1983 liability, and all individual-capacity claims against her will be dismissed. *Id.*

      b.    *Dean James Thompson*

Plaintiffs also have not identified any personal involvement by Defendant Dean James Thompson that would give rise to any individual § 1983 liability. Plaintiffs allege that on February 25, 2022, she emailed Dean Thompson about the care her dog had been receiving and "asking for help to address the emergency situation." [Doc. 23, ¶ 297]. She alleges Defendant Thompson did not reply to her email. [*Id.* at ¶ 298]. Rives has not alleged that Defendant Thompson was "personally involved in the alleged deprivation of federal rights . . . ." *Frazier*, 41 F. App'x at 764. She asserts Defendant Thompson is liable based solely on his position as Dean. This, of course, is not permissible. *See Iqbal*, 556 U.S. at 676. All individual capacity claims against Dean Thompson will be dismissed.

      c.    *Department Head Jeurgen Schumacher, Director Wereszczak, Kimberly Anderson, Virginie Wurlod-Talbot, Caitlin McManemon, Brett Hogberg, and Jack Lee*

      i.    *Counts One and Two against these Defendants in their individual capacity*

The Court next considers the claims against these Defendants sued in their individual

capacities. To state a claim under 42 U.S.C. § 1983, a plaintiff must allege "(1) the defendant acted under color of state law; and (2) the defendant's conduct deprived the plaintiff of rights secured under federal law." *Chambers v. Sanders*, 63 F.4th 1092, 1096 (6th Cir. 2023) (quoting *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010)) (internal quotation marks omitted).

Plaintiffs claim "Defendants … exercised complete dominion and control over Hickory, while he was hospitalized at UTSAH from February 4, 2022 to March 5, 2022, and as a result of their intentional, willful, wanton, and criminal actions under 'color of state authority' deprived Dyllan Rives of her 'property' Hickory" [Doc. 23, ¶ 361]. They further contend Defendants "deprived Dyllan Rives … of exorbitant sums of money under duress while threatening Dyllan Rives' personal property, Hickory . . . ." [Doc. 23, ¶ 369]. Plaintiffs argue these actions offended due process [Doc. 27, pgs. 11–16]. Defendants counter that there was no unconstitutional deprivation of Plaintiffs' property interests and in any event the defendants sued in their individual capacities are entitled to qualified immunity [Doc. 26, pgs. 12–14, 17–19].

"Qualified immunity shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights." *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 608 (6th Cir. 2015). "A plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity." *Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019) (citation omitted). Courts "evaluate qualified immunity in two, non-sequential steps: whether the facts alleged show the officer's conduct violated a constitutional right and whether that right was clearly established." *Harris v. City of Saginaw*, 62 F.4th 1028, 1033 (6th Cir. 2023) (quoting *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)) (internal quotation marks omitted). The Court examines these requirements in turn.

11

The Fourteenth Amendment's Due Process Clause prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. To make out a due process violation, Plaintiffs must show: "(1) [they] had a life, liberty, or property interest protected by the Due Process Clause; (2) [they were] deprived of that interest; and (3) the state did not afford [them] adequate procedural rights prior to depriving [them] of the property interest." *King v. Montgomery Cnty.*, 797 F. App'x 949, 956 (6th Cir. 2020) (citing *O'Neill v. Louisville/Jefferson Cnty. Metro Gov't*, 662 F.3d 723, 732 (6th Cir. 2011)). "[T]he government does not deprive an individual of property within the meaning of the Due Process Clause when that property is voluntarily surrendered." *Id.* at 958.

Here, the parties do not dispute that Plaintiffs had a property interest in Hickory [*See* Doc. 27, pg. 11; Doc. 32, pg. 3]. But Defendants contend "[a]t no time was Hickory ever taken from Plaintiffs involuntarily, and at no time did any [UT]SAH official deny a request by Plaintiffs to take Hickory" [Doc. 26, pg. 13]. Indeed, the Amended Complaint alleges Plaintiffs brought Hickory to the hospital and surrendered him voluntarily [Doc. 23, ¶¶ 58–61].

Plaintiffs, however, contend they "had no choice" but to leave Hickory in Defendants' custody because Defendants overdosed Hickory intentionally to force him onto the ventilator and extort Plaintiffs to pay for his care [Doc. 27, pgs. 12–13]. But that is not what the Amended Complaint shows. Guided by McManemon and others, Dyllan Rives attempted to find the right dose of Hickory's medication while keeping him at home [Doc. 23, ¶ 36, 47, 50, 54]. After Hickory experienced an adverse reaction, McManemon determined the best course was to adjust his medication at the hospital [Doc. 23, ¶ 63]. McManemon started him at a quarter tablet every twelve hours [Doc. 23, ¶¶ 64–65, 75]. Although Hickory was "responding well," McManemon increased the frequency to every eight hours [Doc. 23, ¶ 75]. When Hickory showed potential

12

signs of another adverse reaction, the veterinarian's notes show reducing the dose again [Doc. 23, ¶ 78]. However, someone gave Hickory three eighths of a tablet before McManemon could examine him, and as a result, personnel at UTSAH administered an antidote and stopped the medication [Doc. 23, ¶ 82–84]. When Hickory's condition worsened to the point he needed a ventilator, McManemon put him on what she claimed was the lowest possible dose to keep Hickory alive [Doc. 23, ¶¶ 96, 114]. McManemon continued that medication until Elisa Rives confronted her, after which Plaintiffs stopped hearing from McManemon [Doc. 23, ¶¶ 148, 152, 155]. Defendants reduced Hickory's dose because he was not responding to the medication [Doc. 23, ¶¶ 163, 166, 176]. Plaintiffs later found out Hickory needed the ventilator because of adverse reactions to the medication, not pneumonia as McManemon had told Plaintiffs [Doc. 23, ¶¶ 180–81]. Plaintiffs claim McManemon lied about why Hickory was on the ventilator and covered up the fact that he had been having adverse reactions to his medications [Doc. 23, ¶¶ 170, 173]. But even if she did, that does not mean she was scheming to strategically overdose Hickory. At most, the allegations show McManemon overestimated how much medication Hickory needed, then refused to admit it. Similarly, even if care providers later understated promising results of a breath test, [*see* Doc. 23, ¶¶ 185–86], that does not mean Hickory was in fact ready to come off the ventilator, nor that they were conspiring to keep him on it for longer than was necessary. While the allegations could plausibly support a claim for veterinary malpractice, they do not establish a constitutional violation. *See Hardrick v. City of Detroit*, 876 F.3d 238, 247 (6th Cir. 2017) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)) ("[N]egligent conduct by a state official, even though causing injury, does not constitute a deprivation under the Due Process Clause.") (internal quotation marks omitted).

In support of their argument that they suffered a due process deprivation, Plaintiffs cite the

Sixth Circuit's decision in *O'Neill* [Doc. 27, pg. 12]. There, city animal-control officials impounded two adult dogs and a litter of puppies after determining the owners lacked a breeding permit supposedly required by local ordinance. *O'Neill*, 662 F.3d at 727–28.[2] Officials never issued any notice or citation to the ordinance the owners had allegedly violated. *Id.* When the owners sought to retrieve the dogs, protesting that the impoundment was unlawful, the animal control director stated he had "created" the ordinance and it gave him the authority he needed. *Id.* He nonetheless made them a deal: instead of arresting the owners and fining them $3,000, he would allow them to take the dogs if they paid a lesser sum then and there. *Id.* The court held animal control violated due process by failing to issue the notice required by the ordinance and by threatening the owners with arrest without notifying them of the charges. *Id.* at 734. The court rejected the city's argument analogizing the "deal" to a plea bargain, noting the lack of notice to the owners and likening the "under-the-table, improper air" about the deal to a "pseudo-shakedown." *Id.*

Here, by contrast, Defendants did not "impound" Hickory [Doc. 23, ¶¶ 58–61]. Plaintiffs sought care for him, and Defendants placed him on a ventilator with Plaintiffs' consent after his condition worsened [Doc. 23, ¶¶ 96–97]. Schumacher asked Dyllan Rives how long she was willing to keep Hickory on the ventilator, to which she replied "there is no timeline" [Doc. 23, ¶¶ 211–214]. Hickory therefore stayed on the ventilator for 21 days incurring increasing cost throughout that time until his condition improved enough for him to be discharged, though sadly not enough to prevent his passing less than three weeks later [Doc. 23, ¶¶ 316, 345]. Defendants sought deposits to secure payment of the eventual bill, but those deposits lack the "under-the-table,

---

[2] The Sixth Circuit ultimately determined the ordinance in fact did not require the owners to have a permit. *O'Neill*, 662 F.3d at 730.

improper air" of the faux-plea deal in *O'Neill*. 662 F.3d at 734. They instead provided Defendants security in case Plaintiffs later failed to pay. Unlike the impoundments in *O'Neill*, every escalation in the level of Hickory's end-of-life care was voluntary. Plaintiffs fail to allege a violation of the Due Process Clause.

Plaintiffs also assert a § 1983 claim based on "Equal Protection of Law" [Doc. 23, Count One]. The Fourteenth Amendment's Equal Protection Clause provides: "No State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. "Fundamentally, the Clause protects against invidious discrimination among similarly-situated individuals or implicating fundamental rights." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). "The threshold element of an equal protection claim is disparate treatment . . . ." *Id.* An equal protection claim cannot succeed if it fails to allege the plaintiff received worse treatment than others similarly situated. *See Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011).

Here, Plaintiffs assert Defendants failed to treat them equally to other members of the public by informing Plaintiffs they would no longer be clients of UTSAH [Doc. 27, pg. 16]. But Plaintiffs have not pled an Equal Protection claim because they have not explained how Defendants treated them worse than similarly situated individuals. Indeed, the Amended Complaint alleges a number of contentious exchanges between Plaintiffs and Defendants but not different treatment. Elisa Rives commented to McManemon she was not writing a "blank check . . . for any additional mistakes" [Doc. 23, ¶ 152]. When Elisa Rives "questioned Wereszczak about the comment about getting the money before an animal dies," she "vehemently, ang[ril]y, and loudly den[ied]" ever making such a comment [Doc. 23, ¶¶ 287–88]. Police responded and escorted Dyllan and Elisa Rives from the room [Doc. 23, ¶ 290]. Dyllan Rives called for the police

to escort her on her visit to Hickory the following day, but they reported to the UTSAH front desk instead following a call from Wereszczak concerning two "disturbed individuals" [Doc. 23, ¶ 294–95]. Elisa Rives emailed the Dean of the College of Veterinary medicine regarding Hickory's care [Doc. 23, ¶ 297]. Following these interactions between the parties, Defendants wrote a letter stating Defendants "will not see you as a client of the Small Animal Hospital anymore" [Doc. 23, ¶ 337]. Plaintiffs have not pled an Equal Protection claim.

Even if Plaintiffs had alleged Defendants violated a right guaranteed by the Equal Protection Clause regarding their veterinarian care of Plaintiffs' dog, qualified immunity still bars their claim. The right at issue was not "clearly established." *Harris*, 62 F.4th at 1033. A right is clearly established only if "existing precedent … place[s] the statutory or constitutional question confronted by the official beyond debate." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)) (internal quotation marks omitted). Plaintiffs must "identify a case whose facts and holding would make clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Machan v. Olney*, 958 F.3d 1212, 1215 (6th Cir. 2020) (quoting *District of Columbia v. Wesby*, ⸺ U.S. ⸺, 138 S. Ct. 577, 590 (2018)) (internal quotation marks omitted). Plaintiffs have cited no case in which veterinarians violated the Constitution by providing inadequate care. Defendants were on notice that government *seizure* of an animal implicates the Constitution. *See O'Neill*, 662 F.3d at 734; *see also King*, 797 F. App'x at 957 (affirming dismissal of due process claim for a seized dog adopted out without a hearing where plaintiff failed to exhaust state remedies); *Hardrick*, 876 F.3d at 247 (same, where dog owners contesting seizure failed to offer evidence the state deliberately sickened and killed their dogs and failed to show the state offered no remedy). But here, Plaintiffs have not alleged any seizure.

Plaintiffs push back on Defendants' assertion of qualified immunity, arguing that Defendants were not "acting within their discretionary authority" [Doc. 27, pg. 25]. To be sure, "[o]nly officials performing discretionary, as opposed to ministerial, functions are entitled to qualified immunity from suit." *Davis v. Holly*, 835 F.2d 1175, 1178 (6th Cir. 1987) (citation omitted) (internal quotation marks omitted). Discretionary functions "are those which involve significant decision-making that entails personal deliberation, decision and judgment." *Id.* (citation omitted). Here, as alleged in the Complaint, Defendants Schumacher, Wereszczak, Anderson, Wurlod, McManemon, Hogberg, and Lee were public employees and/or veterinarians charged with caring for Hickory [*See* Doc. 23, ¶¶ 10–16].[3] The Amended Complaint exhaustively details decisions they made concerning his care [*See, e.g.*, Doc. 23, ¶¶ 63–64, 79, 96, 98, 120, 139–144, 158–59, 184–85, 193, 204–206, 209–15, 221, 229–30, 239–41]. Their functions were discretionary. The allegations do not remotely suggest they took actions which exceeded their authority as Hickory's veterinarians.

Plaintiffs also cite *Wyatt v. Cole*, 504 U.S. 158 (1992) [Doc. 27, pg. 27]. There, the Supreme Court held that private actors who conspire with state officials to violate constitutional rights are not entitled to qualified immunity. 504 U.S. at 168. *Wyatt* does not apply here. Defendants are state employees, not private actors. As explained, their actions did not violate Plaintiffs' clearly established constitutional rights. They are entitled to qualified immunity.

Accordingly, Counts One and Two against these Defendants in their individual capacity are hereby **DISMISSED**.

---

[3] The Amended Complaint notes Wurlod is an assistant professor at the Louisiana State University ("LSU") School of Veterinary Medicine, not the University of Tennessee [*See* Doc. 23, ¶ 13]. The Fifth Circuit has previously granted qualified immunity to LSU professors. *See Babinski v. Sosnowsky*, 79 F.4th 515, 524 (5th Cir. 2023).

*ii.*     *Count Three – Racketeer Influenced and Corrupt Organizations Act ("RICO")*

The Court next considers Count Three against Defendants Schumacher, Wereszczak, Anderson, Wurlod, McManemon, Hogberg, and Lee in their individual capacity. Plaintiffs assert a claim under RICO [Doc. 23, ¶¶ 372–80]. A RICO claim consists of "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Courser v. Allard*, 969 F.3d 604, 621 (6th Cir. 2020) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). To show racketeering activity, Plaintiffs must allege a predicate act. *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 513 (6th Cir. 2010). Here, Plaintiffs assert Defendants committed the predicate act of extortion [Doc. 23, ¶¶ 376–80]; *see* 18 U.S.C. § 1961 (including as a predicate any act which is indictable under 18 U.S.C. § 1951, including extortion). Extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). "Extortion can occur either through (1) the threat of force, violence, or fear; or (2) the color of official right." *Mcneil v. Cmty. Prob. Servs.*, LLC, No. 1:18-CV-00033, 2021 WL 366776, at *11 (M.D. Tenn. Feb. 3, 2021) (quoting *United States v. Watson*, 778 F. App'x 340, 345 (6th Cir. 2019)) (internal quotation marks omitted). To proceed on a theory of "force, violence, or fear," a plaintiff must allege "(1) that the defendants obtained the plaintiffs' property (2) through the wrongful use of (3) threats or fear of physical or economic harm." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 407 (6th Cir. 2012). A "color of official right theory" requires that a public official receive a "payment to which he was not entitled, knowing that the payment was made in return for official acts." *United States v. Kelley*, 461 F.3d 817, 826 (6th Cir. 2006) (quoting *Evans v. United States*, 504 U.S. 255, 268 (1992)). "Extortion by a public official does, however, require some quid pro quo." *Watson*, 778 F. App'x at 345 (6th Cir. 2019) (citing *Evans*

18

*v. United States*, 504 U.S. 255, 268 (1992))

Here, Plaintiffs allege Defendants "acting under 'color of official right,' used their public office to unfairly cause Dyllan Rives to part with her personal property, Hickory, thereby preventing Dyllan Rives from taking Hickory to North Carolina State University for treatment" [Doc. 23, ¶ 373]. They claim, "McManemon said she did not know about transporting a patient on oxygen, but Dyllan Rives explained she had an oxygen machine and asked McManemon to write a referral" [Doc. 23, ¶ 90]. Plaintiffs assert that despite McManemon's agreement to write a referral, the record does not contain one [Doc. 23, ¶ 91].[4] But, as Defendants point out, the Amended Complaint does not allege a referral was necessary, nor that anything prevented Plaintiffs from picking Hickory up and taking him to North Carolina State University [Doc. 32, pg. 10]. In any event, Plaintiffs fail to allege a quid pro quo. If allowing UTSAH to retain custody of Hickory was a condition to Defendants' performance of some official act for Plaintiffs, Plaintiffs fail to explain what that official act was supposed to be.

Plaintiffs also allege "Defendants . . . acting under color of official right intentionally, wantonly, maliciously, and criminally exploited the bond between Dyllan Rives and Hickory, and exploited Hickory as an integral part of a scheme to extort unconscionable sums of money" [Doc. 23, ¶ 376]. As explained above, Plaintiffs fail to plausibly allege Defendants intentionally overdosed Hickory to coerce them into parting with the cost of his care. Instead, Plaintiffs allege Defendants required Plaintiffs to prepay portions of veterinary bills to keep Hickory on the ventilator in case Plaintiffs later refused to pay [Doc. 23, ¶¶ 108, 151, 157, 243, 250, 293, 316].

---

[4]     In fact, the Amended Complaint states: "McManemon said she would write the referral, but the record *does contain* a referral to NCSU" [Doc. 23, ¶ 91] (emphasis added). In context, this appears to be a typographical error. Nonetheless, whether or not McManemon in fact referred Hickory to North Carolina State University is irrelevant—as far as the Amended Complaint alleges, UTSAH never refused to surrender Hickory back to Plaintiffs.

19

Plaintiffs fail to explain how those actions were "wrongful," *see* 18 U.S.C. § 1951(b)(2), or why Defendants were "not entitled" to their veterinary bills. *Kelley*, 461 F.3d at 826.

In sum, Plaintiffs fail to plausibly allege Defendants extorted them. Because Plaintiffs do not assert Defendants committed any other predicate acts to support their RICO claim, that claim fails. Count Three is **DISMISSED**.

      *iii.*     *Count Four – Civil Conspiracy under 42 U.S.C. § 1985*

Plaintiffs assert a claim for "Civil Conspiracy (42 U.S.C. § 1985)" [Doc. 23, Count Four]. They assert "Defendants engaged in a conspiracy in violation of Section 1985 by extending Hickory's time on the ventilator while proposing unwarranted costly diagnostic procedures to deprive Plaintiffs of their property and liberty interests" [Doc. 27, pgs. 13–14]. They claim Defendants "engaged in a civil conspiracy for the purpose of coercing Dyllan Rives[] to kill Hickory in an attempt to relieve the bailee (UTSAH/UTCVM) and other named and unnamed defendants of liability" [Doc. 23, ¶ 384]. Section 1985 provides: "If two or more persons in any State or Territory conspire … for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws … the party so injured or deprived may have an action for the recovery of damages …." 42 U.S.C. § 1985(3). The statute "reaches only conspiracies targeting a person based on a classification (like racial discrimination) that would receive heightened scrutiny under the Supreme Court's equal-protection framework." *Post v. Trinity Health-Michigan*, 44 F.4th 572, 580 (6th Cir. 2022) (citation omitted). Plaintiffs do not allege that they are members of any such class, nor that the alleged conspiracy was based on any classification. Plaintiffs' § 1985 claim therefore fails. Count Four is **DISMISSED**.

      *iv.*     *Count Five – Threat, Intimidation, and Malicious Harassment under 42 U.S.C. §§ 1983 and 1985.*

Plaintiffs assert a claim for "Threat, Intimidation, and Malicious Harassment" under 42 U.S.C. §§ 1983 and 1985. Plaintiffs claim "Schumacher and Wereszczak under color of state authority in a show of force and intimidation threatened Dyllan Rives in a further attempt to get her to kill Hickory by calling University Police" [Doc. 23, ¶ 389]. But "[i]n order to state a claim for relief under § 1983, there must be an actual infringement of a constitutional right, not merely a threat to do so." *Monday v. Smith*, No. 3:11-CV-96, 2012 WL 928375, at *3 (E.D. Tenn. Mar. 19, 2012) (citing *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir.1989) and *Macko v. Byron*, 760 F.2d 95, 97 (6th Cir.1985)). Plaintiffs fail to show how Defendants' act of calling the police was anything more than a threat, nor do Plaintiffs even allege they threatened to violate the Constitution. Plaintiffs similarly fail to state a claim under Section 1985, which does make "force, intimidation, or threat" actionable, but only when employed to (1) interfere with the duties of an officer of the United States; (2) obstruct witness testimony, jury service, or "the due course of justice" with the intent to deny equal protection; or (3) intimidate a voter. *See* 42 U.S.C. § 1985. None of these circumstances applies to Plaintiffs.

Moreover, the Court's research has revealed no case embracing a claim for "malicious harassment" under federal law. Tennessee law does provide a cause of action for malicious harassment, but Plaintiffs' complaint fails under state law as well. "[A] claim of malicious harassment requires … that a person acted maliciously" and "unlawfully intimidated another from the free exercise or enjoyment of a constitutional right by injuring or threatening to injure or coercing another person or by damaging, destroying or defacing any real or personal property of another person." *Washington v. Robertson Cnty.*, 29 S.W.3d 466, 473 (Tenn. 2000). To state a claim, a plaintiff must allege "that the offending conduct was motivated by the plaintiff/victim's race, color, religion, ancestry or national origin." *Bowman v. City of Memphis*, 329 S.W.3d 766,

21

768 (Tenn. Ct. App. 2010). Here, again, Plaintiffs have not alleged Defendants' actions were motivated by Plaintiffs' membership in any protected class under Tennessee law. Plaintiff's claims in Count Five therefore fail, and Count Five is **DISMISSED**.

> v.     Counts Six and Seven – *Breach of Fiduciary Duty, Duty of Care, and Intentional Infliction of Emotional Distress under Tennessee Law*

Plaintiffs next assert claims under Tennessee law for breach of fiduciary duty and duty of care and intentional infliction of emotional distress [Doc. 23, ¶¶ 393–401]. Defendants argue they are immune to suit under Tenn. Code Ann. § 9-8-307, [Doc. 26, pg. 22], which provides: "State officers and employees are absolutely immune from liability for acts or omissions within the scope of the officer's or employee's office or employment, except for willful, malicious, or criminal acts or omissions or for acts or omissions done for personal gain." Tenn. Code Ann. § 9-8-307(h). Here, as explained, Plaintiffs have at most alleged veterinary malpractice against University of Tennessee employees acting in the scope of their employment. They have only alleged willful, malicious, or criminal acts in conclusory fashion. Such "labels and conclusions" are insufficient to overcome a motion under Fed.R.Civ.P. 12(b)(6). *Twombly*, 550 U.S. at 555. Because Plaintiffs have at most alleged negligent acts within the scope of Defendants' employment, Defendants are immune under the statute. *See, e.g.*, *Motto v. Mullins*, No. 219CV00081DCLCCRW, 2020 WL 2478275, at *4 (E.D. Tenn. May 13, 2020); *Camillo v. Campbell Clinic, P.C.*, No. 219CV02876SHMATC, 2021 WL 799873, at *4 (W.D. Tenn. Mar. 2, 2021); *Ingram v. Tennessee Dep't of Health*, No. 3:17-CV-01565, 2021 WL 3490025, at *15 (M.D. Tenn. Aug. 9, 2021), *report and recommendation adopted*, No. 3:17-CV-01565, 2021 WL 6066450 (M.D. Tenn. Dec. 22, 2021). Accordingly, Counts Six and Seven fail and are **DISMISSED**.

## IV.     CONCLUSION

For these reasons, Defendants' Motion to Dismiss [Doc. 25] is **GRANTED**. The Amended

Complaint [Doc. 23] is **DISMISSED WITH PREJUDICE**. A separate judgment shall enter.

        **SO ORDERED:**


                                        s/Clifton L. Corker
                                        United States District Judge