**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| Kelly L. Stephens<br>Clerk | 100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988 | Tel. (513) 564-7000<br>www.ca6.uscourts.gov |

Filed: December 13, 2024

Mr. Michael D. Fitzgerald
University of Tennessee
Office of the General Counsel
505 Summer Place
Unit 1111
Knoxville, TN 37902

Ms. Elisa Smith Rives
1226 Holiday Shores Road
Scottsboro, AL 35769

Re: Case No. 24-5336, *Dyllan Rives, et al v. University of Tennessee, et al*
Originating Case No. : 3:22-cv-00414

Dear Counsel,

The Court issued the enclosed opinion today in this case.

Enclosed are the court's unpublished opinion and judgment, entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Sincerely yours,

s/Cathryn Lovely
Opinions Deputy

cc: Ms. LeAnna Wilson

Enclosures

Mandate to issue

NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0522n.06

No. 24-5336

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Dec 13, 2024
KELLY L. STEPHENS, Clerk

DYLLAN RIVES, et al.,

    Plaintiffs-Appellants,

v.

UNIVERSITY OF TENNESSEE, et al.,

    Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE

OPINION

Before: SUTTON, Chief Judge; MURPHY and BLOOMEKATZ, Circuit Judges.

BLOOMEKATZ, Circuit Judge. When Dyllan Rives's dog Hickory fell ill, she took him to the University of Tennessee's pet hospital. Over two months, Dyllan and her father James Rives spent more than $75,000 on Hickory's treatment. Despite their efforts, Hickory did not survive his illness. Frustrated by the outcome and high cost of Hickory's treatment, Dyllan and James sued the University of Tennessee, two of its subsidiaries, and several of its employees under federal and state law. They alleged that the University and its affiliates sabotaged Hickory's care to drive up his medical bills. The University and its affiliates moved to dismiss the complaint, and the district court granted their motion. We affirm.

## BACKGROUND

**I.  Factual History**

This case arises from the death of Dyllan Rives's dog, Hickory. On January 11, 2022, Dyllan took Hickory to the University of Tennessee's Small Animal Hospital (UTSAH) after he

No. 24-5336, *Rives v. Univ. of Tenn.*

suddenly fell ill.[1] Caitlin McManemon, a veterinarian at UTSAH, diagnosed Hickory with Myasthenia Gravis, a complex immune disorder that affects muscle control. The medication she prescribed him—a cholinesterase inhibitor—requires precise dosing. Too little medication will allow the condition to worsen, but too much will trigger harmful side effects.

At first, Hickory responded well to his medication. Then he started to show signs of overdose. McManemon told Dyllan to increase Hickory's dose, but that only worsened his condition. Another UTSAH veterinarian told Dyllan to lower his dose, but that did not help either. UTSAH advised Dyllan to re-admit Hickory to the hospital so staff could adjust his medication. It also asked Dyllan to pay a partial deposit for his treatment.

Hickory's condition varied in the following days. From February 4 to February 8, McManemon adjusted his medication multiple times, testing various dosages at different intervals. Hickory briefly responded positively. But when McManemon tried more frequent dosing, his symptoms of overdose returned. Dyllan worried about a potential overdose, but McManemon downplayed Hickory's symptoms, saying they "just need[ed] to play with his dose" more. *See* Am. Compl., R. 23, PageID 172.

On February 9, someone at the hospital gave Hickory an even higher dose before McManemon could re-examine him. Hickory had a severe reaction, requiring an antidote and oxygen support. This prompted Dyllan to seek help elsewhere. She told McManemon she wanted to transfer Hickory to a North Carolina facility for alternative treatment. But before she could do so, Hickory's oxygen levels dropped dangerously low. Without a ventilator, Hickory would die. So Dyllan agreed to ventilation, and the hospital asked for another deposit of several thousand dollars.

---

[1] Because the plaintiffs in this case share a last name, we refer to them by their first names.

No. 24-5336, *Rives v. Univ. of Tenn.*

While Hickory remained on the ventilator, McManemon put him on what she called the "lowest possible dose" of the cholinesterase inhibitor. *Id.* at PageID 177. When Hickory's overdose symptoms persisted, she refused to blame his medication. And each new complication brought about another request from UTSAH for additional deposits. Dyllan's mother, Elisa Rives, warned McManemon that the Riveses wouldn't write "a blank check" for "additional mistakes." *Id.* at PageID 181. But McManemon rejected any link between an overdose and Hickory's need for ventilation, attributing his episode to other factors like exhaustion. After this exchange, McManemon stopped communicating with Dyllan altogether. But Hickory remained at the hospital, and the calls for more deposits continued.

On February 24, a resident at UTSAH told Dyllan that Hickory was not responding to his medication, so they wanted to try a lower dose next. Dyllan and Elisa saw this as proof that McManemon had lied about using the lowest possible dose already, so they requested a meeting with emergency care staff. At the meeting, the staff said Hickory had been adversely reacting to his medication "all along." *Id.* at PageID 185. And when Dyllan said an overdose had forced Hickory on ventilation, the staff nodded in agreement. Dyllan viewed this response as proof that McManemon had lied, again, when she said the medication was not the reason Hickory needed ventilation.

Hickory remained at the hospital, but he showed few, if any, signs of improvement. After the hospital requested two more deposits, Dyllan met with Leslie Wereszczak, a UTSAH director, hoping to reach "some kind of financial arrangement." *Id.* at PageID 192–93. During the meeting, Dyllan voiced her dissatisfaction with the hospital's mistakes in treating Hickory. But Wereszczak firmly denied any shortcomings in Hickory's treatment. She also insisted that the deposits were

non-negotiable because some pet owners abandon their bills if their pet dies at the hospital. As costs mounted, James stepped in to help Dyllan cover Hickory's bills.

On February 24, Hickory's lung collapsed. Dyllan and Elisa rushed to the hospital, and once there, noticed that police were present. They met with Hickory's care team, and after a heated exchange, were escorted out by the police. At UTSAH's request, Dyllan paid another deposit of several thousand dollars for Hickory's continued care.

The next day, Dyllan called the police herself, asking them to escort her on another visit with Hickory. To her surprise, Wereszczak had already called the cops, reporting Dyllan as a "disturbed individual[]." *Id.* at PageID 197. Despite the growing tension, Dyllan had to keep Hickory at the hospital given his ongoing need for ventilation.

On March 2, UTSAH staff returned Hickory to the initial dose he was prescribed after his diagnosis. The next day, Hickory came off the ventilator, ready to be discharged. But UTSAH would not release Hickory until Dyllan paid the rest of his bill. By then, the total cost of Hickory's treatment had soared to $75,681.30. Dyllan paid, and the hospital released Hickory on March 5. At discharge, the hospital informed Dyllan that it would no longer accept her as a client.

Despite his release from the hospital, Hickory remained in poor health. A few days after being discharged, he was diagnosed with kidney damage from his time on the ventilator, and then died approximately two weeks later.

## II.     Procedural History

Dyllan and James brought this lawsuit against the University of Tennessee and two of its subsidiaries—the College of Veterinary Medicine and UTSAH. They also named nine University personnel as defendants (five in their personal capacities, and four in both their official and personal capacities). The Riveses allege that hospital staff intentionally mishandled and prolonged

-4-
Case 3:22-cv-00414-DCLC-JEM     Document 79     Filed 12/16/24     Page 5 of 16
PageID #: 930

No. 24-5336, *Rives v. Univ. of Tenn.*

Hickory's care in order to inflate his medical expenses, in violation of myriad federal and state laws. For their federal claims, they assert that the University and its affiliates (1) violated the Equal Protection and Due Process Clauses of the Fourteenth Amendment, *see* 42 U.S.C. § 1983; (2) operated an extortionate scheme under the Racketeer Influenced and Corrupt Organizations Act (RICO), *see* 18 U.S.C. §§ 1951, 1962; (3) conspired to violate the Riveses' civil rights, *see* 42 U.S.C. § 1985; and (4) subjected the Riveses to "threat, intimidation, and malicious harassment," *see id.* §§ 1983, 1985. They also bring two state-law claims, one for breach of fiduciary duty and another for intentional infliction of emotional distress. The University and its affiliates collectively moved to dismiss the complaint under Rules 12(b)(1) and 12(b)(6). They argued that the Riveses' claims were either barred by various immunity doctrines or factually implausible.

The district court dismissed the complaint with prejudice. *First*, it ruled that state sovereign immunity barred the claims against the University, its subsidiaries, and its employees in their official capacity. *Second*, it held that the federal claims were implausible, mainly because the Riveses failed to plead they suffered any coercion, deliberate misconduct, or unequal treatment. *Third*, the district court rejected the Riveses' state-law claims based on absolute immunity. The Riveses appealed.

## ANALYSIS

We review de novo a district court's decision on a motion to dismiss. *See Spurr v. Pope*, 936 F.3d 478, 482 (6th Cir. 2019). We accept a complaint's factual allegations as true but disregard all conclusory statements. *See Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The "sheer possibility" of

No. 24-5336, *Rives v. Univ. of Tenn.*

unlawful conduct is not enough. *Id.* We generally apply the same standard in reviewing jurisdictional issues like sovereign immunity. *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1045–46 (6th Cir. 2015).

**I.     Sovereign Immunity**

We first consider whether Eleventh Amendment sovereign immunity bars the Riveses' claims against the University, its subsidiaries, and its employees in their official capacity. We conclude that it does.

Sovereign immunity generally shields states, their agencies, and their officials from suit. *Lewis v. Clarke*, 581 U.S. 155, 161–62 (2017); *Doe v. DeWine*, 910 F.3d 842, 848 (6th Cir. 2018). Time and again, we have held that the University of Tennessee functions as an arm of Tennessee and thus enjoys sovereign immunity. *See Boinapally v. Univ. of Tenn.*, 23 F. App'x 512, 515 (6th Cir. 2001) (order); *Drew v. Univ. of Tenn. Reg'l Med. Ctr. Hosp.*, 211 F.3d 1268, 2000 WL 572064, at *3 (6th Cir. 2000) (unpublished table decision); *Woolsey v. Hunt*, 932 F.2d 555, 564–68 (6th Cir. 1991). That immunity extends to the University's subsidiaries and employees when sued in their official capacity. *See Boler v. Earley*, 865 F.3d 391, 409–10 (6th Cir. 2017).

The Riveses challenge this consistent holding. They say the University is not an arm of the state because it operates independently and generates revenues, kept in accounts separate from the state treasury, that can be used to satisfy a judgment.

We find these arguments unconvincing. In determining whether an entity operates as an arm of a state, we look to (1) the state's potential liability for a judgment, (2) how state statutes and courts refer to the entity, (3) whether the state appoints the entity's board, and (4) whether the entity performs governmental functions. *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 775 (6th Cir. 2015). Here, Tennessee has expressly designated all University funds as "state funds," regardless

No. 24-5336, *Rives v. Univ. of Tenn.*

of their source or where they are held. Tenn. Code Ann. § 9-1-103. Tennessee statutes repeatedly refer to the University as a state entity. *See, e.g.*, *id.* § 13-18-126(a). The governor and state legislature select ten of the eleven voting members of the University's board of trustees, with the state commissioner of agriculture serving as the eleventh voting member. *Id.* § 49-9-202(a)(1), (c)(1)(A). And higher education, the function served by the University, qualifies as a state function. *Kreipke*, 807 F.3d at 779–80. The University, its subsidiaries, and its officials are thus entitled to sovereign immunity.

The Riveses fail to show that an exception to sovereign immunity applies here. *See Boler*, 865 F.3d at 410. *First*, states may consent to suit in federal court through unambiguous statutory language or conduct in litigation. *Id.*; *Sossamon v. Texas*, 563 U.S. 277, 284 (2011). Tennessee has not consented to this particular lawsuit, so the question is whether it has consented to the Riveses' claims by statute. The Riveses rely on *Soni v. Board of Trustees of the University of Tennessee*, where we held Tennessee had consented to suits against the University, thus waiving the University's immunity. 513 F.2d 347, 352 (6th Cir. 1975). Tennessee, however, responded to *Soni* by codifying the University's immunity through statute. *See* Tenn. Code Ann. §§ 9-1-103, 20-13-102; *Woolsey*, 932 F.2d at 565. We decline the Riveses' request to follow *Soni* despite Tennessee's clear subsequent assertion of sovereign immunity.

*Second*, Congress may abrogate state sovereign immunity to enforce the Fourteenth Amendment. *Boler*, 865 F.3d at 410. But § 1983, the statute invoked by the Riveses, does not allow suits against the states. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989). So this exception cannot save the Riveses' claims either.

*Finally*, the *Ex parte Young* doctrine allows federal courts to issue prospective injunctions against state officials to stop ongoing violations of federal law. *Boler*, 865 F.3d at 410, 412.

No. 24-5336, *Rives v. Univ. of Tenn.*

In relying on this exception, the Riveses argue that the University's officials are still violating their rights by retaining their "wrongfully obtained" payments. Appellants Br. at 37. But that is simply a repackaging of a claim for monetary damages, and *Ex parte Young* provides no avenue for such relief. *See Ladd v. Marchbanks*, 971 F.3d 574, 581 (6th Cir. 2020). We therefore affirm the district court's dismissal of the claims against the University entities and the official-capacity claims against their employees.

## II.     Federal Individual-Capacity Claims

Next, we consider the Riveses' federal claims against the University's employees in their individual capacities. We address each claim in turn and conclude that none states a plausible basis for relief.

### A.     Equal Protection

The Riveses assert a § 1983 claim under the Equal Protection Clause of the Fourteenth Amendment. They allege that the University's employees violated equal protection by overdosing Hickory, prolonging his hospitalization, and ultimately causing his death. They also allege that the University's employees denied them equal protection through their decision, after Hickory's discharge, to no longer accept the Riveses as clients.

These allegations do not state an equal protection claim. To state such a claim, the Riveses must allege that hospital staff treated them differently from other similarly situated individuals. *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379–80 (6th Cir. 2011). The Riveses, however, make no effort to plead such differential treatment. Their equal protection claim thus fails.

No. 24-5336, *Rives v. Univ. of Tenn.*

### B. Due Process

The Riveses also bring a § 1983 due process claim under the Fourteenth Amendment. They contend that the University's employees unlawfully deprived them of their property: Hickory and the money the Riveses spent on his medical treatment. They say the University's employees deprived them of this property by wrongfully taking Hickory into custody, and then using him to extract thousands of dollars from the Riveses.

These allegations also fail to sustain a due process claim. To start, Dyllan voluntarily admitted Hickory to UTSAH, not once, but twice. Put differently, the initial "taking" of Hickory came about because Dyllan chose to surrender him to UTSAH. The Riveses' contention that University staff confiscated Hickory therefore lacks merit. *Compare O'Neill v. Louisville/Jefferson Cnty. Metro Gov't*, 662 F.3d 723, 732 (6th Cir. 2011) (due process violated where defendants took the plaintiffs' dogs without consent, neutered and spayed them, and then required the plaintiffs to pay money to retrieve them), *with King v. Montgomery County*, 797 F. App'x 949, 958 (6th Cir. 2020) (due process was not violated where dogs were voluntarily surrendered).

The events that unfolded after Dyllan placed Hickory with UTSAH likewise do not amount to a due process violation. To state a due process claim, the Riveses must allege deliberate conduct by the University's employees; mere negligence will not do. *Daniels v. Williams*, 474 U.S. 327, 332–33 (1986); *Hardrick v. City of Detroit*, 876 F.3d 238, 247 (6th Cir. 2017). So throughout their complaint, the Riveses assert that the University's staff acted "intentionally," "willfully," or "maliciously." *E.g.*, Am. Compl., R. 23, PageID 205. But these are exactly the kind of allegations that *Iqbal* rejected as too conclusory to state a claim. 556 U.S. at 680–81. Other than these conclusory allegations, the Riveses plead no concrete facts to support their position that the

No. 24-5336, *Rives v. Univ. of Tenn.*

University's employees mistreated Hickory on purpose or did so as part of an extortionate campaign. As the district court recognized, they have at most alleged medical malpractice. And "[m]edical malpractice does not become a constitutional violation merely because . . . the defendant is a state official." *Daniels*, 474 U.S. at 333 (citation omitted). Accordingly, the Riveses' due process claim fails.

      **C.**      **The Racketeer Influenced and Corrupt Organizations Act**

The Riveses also claim that the University's employees violated RICO. 18 U.S.C. § 1962. Congress enacted RICO to combat organized "racketeering activity." *Id.* Only certain unlawful actions, known as "predicate act[s]," meet RICO's definition of "racketeering." *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 513 (6th Cir. 2010). To state a RICO claim, the Riveses must plausibly allege that the University's employees committed such a predicate act. *Id.* For this, they rely on Hobbs Act extortion. *See* 18 U.S.C. § 1951. According to the Riveses, the University's employees botched Hickory's care so they could extort money from the Riveses for his extended treatment.

But the Riveses do not plausibly allege that a private party, rather than the state itself, was the intended beneficiary of their payments, dooming their Hobbs Act extortion claim. The Hobbs Act does not apply when the alleged extortion is meant to benefit the state. As the Supreme Court has explained, the Hobbs Act incorporates the common law conception of extortion. *Wilkie v. Robbins*, 551 U.S. 537, 563–64 (2007). And at common law, extortion targeted "the sale of public favors for private gain," not "overzealous efforts" by officials "to obtain property on behalf of the Government." *Id.* at 564. Consequently, extortion-based RICO claims cannot proceed against officials who act to benefit the state. *Id.* at 541, 567. Yet that's all the Riveses allege here. The Riveses admit that UTSAH kept "all funds" derived from "client services," like their payments for

No. 24-5336, *Rives v. Univ. of Tenn.*

Hickory's care. Appellants Br. at 23. Therefore, their Hobbs Act extortion claim cannot serve as a predicate offense, and their RICO claim fails.

### D.      Section 1985

The Riveses also bring a civil conspiracy claim under 42 U.S.C. § 1985(3).[2] That statute prohibits conspiracies "for the purpose of depriving . . . any person or class of persons of the equal protection of the laws" or "equal privileges and immunities under the laws." *Id.* The Riveses seem to rely on the same allegations underlying their due process and equal protection claims for their § 1985(3) claim.

The Riveses' allegations fall outside § 1985(3)'s ambit. Congress enacted § 1985 to address the racial violence perpetrated by groups like the Ku Klux Klan after the Civil War and during Reconstruction. *See Post v. Trinity Health-Michigan*, 44 F.4th 572, 579 (6th Cir. 2022). In line with this purpose, the Supreme Court has held that § 1985(3) targets only conduct motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). Our court has since clarified that § 1985(3) applies only to conspiracies targeting individuals based on classifications—like race or religion—that receive heightened scrutiny under the Equal Protection Clause. *Post*, 44 F.4th at 580. It does not provide relief for general misconduct or personal grievances. The Riveses do not allege that their treatment was motivated by any constitutionally protected characteristic. So the district court properly dismissed their claim.

---

[2] The Riveses fail to identify which provision of 42 U.S.C. § 1985 they rely on for this claim, but the nature of their claim and their arguments and case citations point to § 1985(3).

No. 24-5336, *Rives v. Univ. of Tenn.*

### E. Threat, Intimidation, and Malicious Harassment

The Riveses also bring a claim for "threat, intimidation, and malicious harassment" under § 1983 and § 1985. Am. Compl., R. 23, PageID 211–12. They claim they were harassed and threatened when University employees called the police during two of Dyllan's visits with Hickory. Because this claim fails under § 1985 for the reasons we already articulated, we focus our analysis on § 1983.

We affirm the dismissal of this claim because the Riveses have not identified the federal right—or the source of the right—they seek to vindicate. In a § 1983 claim, the plaintiff must identify the federal right they allege was violated. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 282 (2002). The Constitution, however, does not provide the generalized right the Riveses allege here. To be sure, the Constitution shields individuals from government intimidation or harassment, but its protections are anchored to specific constitutional guarantees. For example, state officials run afoul of the First Amendment when they deploy threats and intimidation to suppress speech. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). They also violate the Equal Protection Clause when they racially harass people. *Knop v. Johnson*, 977 F.2d 996, 1014 (6th Cir. 1992). But we are unaware of a freestanding constitutional claim against intimidation or harassment, unmoored from a specific constitutional right. Nor do the Riveses point us to authority suggesting otherwise. On appeal, they purport to base this claim on 18 U.S.C. § 241 and § 242—the criminal counterparts to § 1983 and § 1985. But these criminal statutes do not provide for private civil liability, so they cannot save the Riveses' claim. *See Moore v. Potter*, 47 F. App'x 318, 320 (6th Cir. 2002). Without a cognizable federal right, this claim also fails.

No. 24-5336, *Rives v. Univ. of Tenn.*

### III. Absolute Immunity

Finally, we address the Riveses' state-law claims for breach of fiduciary duty and intentional infliction of emotional distress. These claims implicate absolute immunity under Tennessee law. We agree with the district court that absolute immunity bars these claims.

Under Tennessee law, state officials and employees are "absolutely immune" for conduct within the scope of their employment, "except for willful, malicious, or criminal acts or omissions or for acts or omissions done for personal gain." Tenn. Code Ann. § 9-8-307(h). While Tennessee courts have not fully defined the contours of these exceptions, they have held that the statute provides absolute immunity for, at a minimum, "any act of negligence committed within" a state employee's scope of employment. *See Luther v. Compton*, 5 S.W.3d 635, 641 (Tenn. 1999). And that immunity extends to state-law claims in both federal and state court. *Purisch v. Tenn. Tech. Univ.*, 76 F.3d 1414, 1421 (6th Cir. 1996).

As explained earlier, the Riveses have failed to plausibly allege conduct beyond negligence, so absolute immunity applies. The Riveses respond that Tennessee's immunity provision is unconstitutional because it deprives them of any remedy for state actors' "intentional torts and deprivation of [federal] constitutional rights." Appellants Br. at 50. But the provision neither shields state actors from properly pleaded intentional torts nor forecloses any federal constitutional claims. *See* Tenn. Code Ann. § 9-8-307(h); *Wenk v. O'Reilly*, 783 F.3d 585, 599 (6th Cir. 2015). What's more, Tennessee has waived its sovereign immunity as to certain claims for monetary damages arising from state employees' conduct, provided those claims are brought before the Tennessee Claims Commission. Tenn. Code Ann. § 9-8-307(a)(1). This waiver encompasses claims for the "[n]egligent care, custody or control of animals." *Id.* § 9-8-307(a)(1)(G). The Riveses thus have a potential remedy for their injury, but any such remedy lies

No. 24-5336, *Rives v. Univ. of Tenn.*

not with this court but with the Claims Commission. *See Shelburne v. Frontier Health*, 126 S.W.3d 838, 845 (Tenn. 2003). We therefore affirm the dismissal of their state-law claims.

## CONCLUSION

We affirm the district court's dismissal of the Riveses' claims.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 24-5336

DYLLAN RIVES; JAMES R. RIVES,

    Plaintiffs - Appellants,

v.

UNIVERSITY OF TENNESSEE; DONDE PLOWMAN, individually and as Chancellor; UNIVERSITY OF TENNESSEE COLLEGE OF VETERINARY MEDICINE; JAMES THOMPSON, individually and as Dean; JOHN AND ANN TICKLE SMALL ANIMAL HOSPITAL (UTSAH); JUERGEN SCHUMACHER, individually and as Department Head of UTSAH; LESLIE WERESZCZAK, individually and as Director of Emergency and Critical Care of UTSAH; KIMBERLY ANDERSON; VIRGINIE WURLOD-TALBOT; CAITLIN MCMANEMON; BRETT HOGBERG; JACK LEE; UNKNOWN INDIVIDUALS,

    Defendants - Appellees.

**FILED**
Dec 13, 2024
KELLY L. STEPHENS, Clerk

Before: SUTTON, Chief Judge; MURPHY and BLOOMEKATZ, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.

THIS CAUSE was heard on the record from the district court and was submitted on the briefs without oral argument.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

Kelly L. Stephens, Clerk